Tomow and others, Plaintiffs and Respondents, v. N. E. Isaacson & Associates, Inc., Defendant and Appellant: Menominee Enterprises, Inc., and others, Defendants and Respondents.*

*No. 508. Argued June 4, 1973.—Decided June 29, 1973.*
(Also reported in 208 N. W. 2d 824.)

---

\* Motion for rehearing denied, without costs, on August 14, 1973.

1

2

3

4

8

**4** The plan also provided that upon termination, $1,500 was to be distributed to each enrolled Menominee. After the other assets were transferred to "MEI," it issued a $3,000 income bond to each individual Menominee. The bond is payable on December 1, 2000, and pays 4 percent interest or $120 per year.

14

For the appellant there were briefs by *Welsh, Trowbridge, Planert & Schaefer* of Green Bay, and oral argument by *Vance M. Waggoner,* of Green Bay.

For the plaintiffs-respondents there was a brief by *Joseph F. Preloznik* and *Mary E. Van Gemert,* both of Madison, and oral argument by *Mr. Preloznik.*

For the defendants-respondents there were briefs by *Foley & Lardner* of Milwaukee, and oral argument by *Gilbert W. Church* of Milwaukee.

HANLEY, J. Three issues are presented on this appeal.

1. Did the trial court err in holding that the Menominee common stock and voting trust was not invalid because it was contrary to controlling federal and state law and the United States Constitution;

2. Did the trial court err in holding that art. XII of the articles of incorporation of "MEI" was ambiguous and, therefore, a proper matter for judicial construction; and

3. Did the trial court err in holding that the unsold land which was conveyed by "MEI" to "LOM" without the approval of the individual tribal members was subject to plaintiffs' lis pendens and an injunction prohibiting its sale?

*Validity of voting trust.*

The "Termination Act" which mandated the complete withdrawal of federal supervision and control over the Menominee Tribe called for the formulation of a plan for the future control of tribal property and service

functions by the tribe itself. 25 USC, 896 of the federal statute provided that the plan, when completed, was to be submitted to the secretary of the interior who ". . . *shall accept such tribal plan* as the basis for the conveyance of the tribal property *if he finds that* it will treat with reasonable equity all members on the final roll of the tribe prepared pursuant to Section 893 of this title, and that it conforms to applicable Federal and State law." (Emphasis added.)

Contrary to the contentions of the plaintiffs who are as to this issue appellants on appeal, both the secretary of the interior and the trial court were satisfied that the mandate of 25 USC, 896 was complied with. After a review of the various arguments which the plaintiffs have raised, this court reaches the same conclusion.

The plaintiffs' first contention in support of their conclusion that the voting trust here involved is invalid is that Wisconsin's voting trust statute, sec. 180.27, Stats., was not complied with. Sec. 180.27, was originally enacted by sec. 7 of ch. 731, Laws of 1951, and now provides:

"**Voting trusts and agreements among shareholders.** (1) Any number of shareholders of a corporation may create a voting trust for the purpose of conferring upon a trustee or trustees the right to vote or otherwise represent their shares by entering into a written voting trust agreement specifying the terms and conditions of the voting trust, by depositing a counterpart of the agreement with the corporation at its registered office and by transferring their shares to such trustee or trustees for the purposes of the agreement. Such trustee or trustees shall keep a record of the holders of voting trust certificates evidencing a beneficial interest in the voting trust, giving the names and addresses of all such holders and the number and class of the shares in respect of which the voting trust certificates held by each are issued, and shall deposit a copy of such record with the corporation at its registered office. The counterpart of the voting trust agreement and the copy of such

record so deposited with the corporation shall be subject to the same right of examination by a shareholder of the corporation, in person or by agent or attorney as are the books and records of the corporation, and shall be subject to examination by any holder of a beneficial interest in the voting trust, either in person or by agent or attorney, at any reasonable time for any proper purpose.

"(2) Agreements among shareholders regarding the voting of their shares shall not be subject to the provisions of this section regarding voting trusts." [6]

Under the above statutes, pursuant to an agreement, shareholders transfer their shares to the voting trustees which transfers are in turn recorded on the corporation's books, thereby making the trustees the record holders. During the period of the trust and pursuant to the trust agreement, the trustees vote the shares. In exchange for the shares, voting trust certificates which represent the equitable interest in the shares transferred, and any shares which might be awarded as dividends are issued by the trustees to the original shareholders.

In material part, sec. 180.27, Stats., provides that "Any number of shareholders of a corporation may create a voting trust . . . by entering into a written voting trust agreement . . . ." The thrust of the plaintiffs' argument is that the individual enrolled members and not the C. N. Committee whose members signed as incorporators of "MEI" and who also signed the voting trust agreement were the "shareholders" of the corporation for purposes of entering into the agreement.

---

[6] The statute originally limited a voting trust to not more than twenty years; ten years longer than the Model Code. Even the twenty-year limitation was omitted by ch. 399 of the Laws of 1953. Such unlimited duration is not common to the statutes of most other states. *See* Henn, *Law of Corporations* (1970), p. 392, sec. 197. Sub. (2) of sec. 180.27, exempting shareholder agreements from the provisions of the voting trust statute, was created by sec. 15, ch. 285, Laws of 1971.

Under the articles of incorporation, "MEI" was granted the authority to issue shares of stock and the "MEI" directors accepted the subscription of the C. N. Committee which was originally created by the general council to develop the Termination Plan. The secretary of the interior then advanced $327,000 of the funds he was holding in trust and this money was used to pay for the stock. "MEI" issued a single stock certificate to the committee for 327,000 shares of stock. The C. N. Committee signed the voting trust agreement and named as trustees those individuals previously approved by a general council and transferred the stock "MEI" held in their name to the voting trust. The trustees then issued voting trust certificates to the enrolled Menominees as evidence of their interests in the stock the trustees held, with each certificate representing 100 shares of stock in "MEI."

The defendants contend that the voting trust was formed in exact compliance with sec. 180.27, Stats. Shares in "MEI" were issued to members of the C. N. Committee who then transferred the stock to the trustees on the basis of a written instrument. The shareholders thus created the trust by "entering into a written voting trust agreement" as required by statute. Likewise, this procedure conformed exactly to the provisions in the Termination Plan which was agreed upon by the Menominees.

Plaintiffs contend that the vote of the general council in January of 1959, which approved the Termination Plan—including the voting trust agreement—could not be a substitute for individual "shareholder" approval. This argument, together with the cases which are cited by the plaintiffs, are all predicated on the proposition that individual Menominees had been issued "shares" of stock in "MEI" prior to the formation of the trust.

While it is clear that 25 USC, 893, referring as it does to the "rights or beneficial interests" of each of the enrolled Menominees, "shall constitute personal property . . . evidenced by a certificate of beneficial interest which shall be issued by the tribe" gave to each enrolled Menominee at the very least an undivided one third 270th interest in the assets of "MEI," such an interest cannot be analogous to a "share of stock." Sec. 896 of Title 25, USC, relating to the Termination Plan which the tribe was to formulate, states that "[t]o the extent necessary, the plan shall provide for such terms of transfer pursuant to Section 897 of this title, by *trust or otherwise,* as shall insure the continued fulfillment of the plan." (Emphasis added.) Sec. 897 provides that "[o]n or before April 30, 1961, the Secretary [of the Interior] is authorized *to transfer to the tribal corporation or to a trustee* of the Secretary's choice . . . *the title to all property, real and personal, held in trust by the United States for the tribe."* (Emphasis added.)

The two deeds by which the United States conveyed what now constitutes Menominee county were conveyed to "MEI," not to the individual enrolled Menominees. Likewise, the secretary of the interior advanced the $327,000 of the funds held in trust, not to each enrolled Menominee, but rather to the committee who in turn used it to pay for the stock it had previously subscribed to. Prior to termination, individual enrolled Menominees never had certificates or control over their interests in tribal assets. Indeed, the assets were held in trust by the federal government and were subject to tribal and federal law and not corporate law as the plaintiffs contend.

While it is clear that the original draftees of sec. 180.27, Stats., never contemplated a factual situation like the one presented in this case, it likewise is manifestly clear that the procedures here employed did not

run counter to the statute. The trial court agreed and stated:

"I am impressed by the reasonableness of the method established in the plan contrasted with the unwieldy procedure of having the shares issued to the individual Menominees some of whom would be minors or incompetents and then placed in trust under procedural requirements of section 180.27. It is obvious that a trust arrangement was considered in the best interests of the Menominees in accordance with their own plan. It seems to me the procedure adopted to accomplish this was eminently sensible."

Plaintiffs next contend that the certificate of beneficial interest representing tribal members' rights or beneficial interests in tribal property was issued, transferred and cancelled in violation of 25 USC, 893. Sec. 893 of Title 25, USC, after setting forth a very precise procedure for determining who will be considered an enrolled Menominee with the initial decisions by the tribe, followed by an appeal right to the secretary of the interior, provides:

"When the Secretary has made decisions on all appeals, he shall issue and publish in the Federal Register a Proclamation of Final Closure of the roll of the tribe and the final roll of the members. Effective upon the date of such proclamation, the rights or beneficial interests of each person whose name appears on the roll shall constitute personal property and shall be evidenced by a certificate of beneficial interest which shall be issued by the tribe. Such interests shall be distributable in accordance with the laws of the State of Wisconsin. Such interests shall be alienable only in accordance with such regulations as may be adopted by the tribe."

The certificate itself was executed on June 17, 1964, by James G. Frechette, chairman, Menominee advisory council, and begins as follows:

"This is to certify that the persons whose names are listed in the schedule attached hereto, identified as 'Final Roll-Menominee Tribe of Indians of Wisconsin' (Vol. 22, FEDERAL REGISTER Number 240, pages 9951–9972, inclusive) are the holders (hereinafter sometimes called 'Tribal Members') of undivided equal shares in this Certificate of Beneficial Interest, which evidences the rights and interests of each such person and all of them and the personal representatives, heirs or next of kin of deceased Tribal Members (hereinafter sometimes called 'lawful distributees') to all property, real and personal, now or hereafter, legally or beneficially owned by the Menominee Indian Tribe of Wisconsin. This Certificate has been issued by said Tribe as of June 17, 1954, pursuant to the provisions of section 391, Title 25 U. S. C. and is the Certificate of Beneficial Interest therein described."

It goes on to provide that it is delivered to the C. N. Committee who shall hold it on behalf of the tribal members or their lawful distributees, "According to the terms of the certificate." Thereafter, the C. N. Committee "on behalf of the tribal members will cancel the certificate in accord with the terms and provisions of the 'Plan. . .' " The provisions of the plan relating to the certificate provide that:

"*Description of economic plan.* The economic plan, designed to promote the highest beneficial use of the communal property, is set forth in six basic documents: (1) Articles of Incorporation of Menominee Enterprises, Inc., (2) By-Laws of Menominee Enterprises, Inc., (3) a common stock and voting trust, (4) a bond indenture, (5) a Menominee Assistant trust, (6) a Certificate of Beneficial Interest.

"One Certificate of Beneficial Interest in form attached will be issued pursuant to section 893 Title 25 U. S. C., with list attached thereto of the tribal roll of 3,270 members as of June 17, 1954 (as finally proclaimed.) The Certificate will be issued as of June 17, 1954, in advance of termination date, and will be held by the Coordinating and Negotiating Committee until that date. At that time, the Committee will mark it 'cancelled' and file it with its records.

"It is a part of this Plan that (1) the issue of stock to the said Coordinating and Negotiating Committee, (2) the issue of voting trust certificates to tribal members and lawful distributees of deceased members upon deposit of the stock in the Common Stock and Voting Trust, (3) the issue of income bonds, (4) the transfer of real and personal property to the said Coordinating and Negotiating Committee and/or to Menominee Enterprise, Inc., or any subsidiary, (5) the transfer of real and personal property to any public body; shall all be in substitution for and consideration of cancellation of the Certificate of Beneficial Interest and no one shall thereafter have any rights or interest in such Certificate."

The plaintiffs contend that the chairman of the advisory council had no authority to issue the certificate since by express terms of 25 USC, 893 only the "tribe" could issue the certificate. Likewise, they contend that the chairman had no authority to authorize the C. N. Committee to cancel the certificate .in accordance with the terms and provisions of the Termination Plan. Assuming the chairman did have authority to issue the certificate, the plaintiffs contend the C. N. Committee did not have authority to cancel the certificate in exchange for "MEI" stock.

First of all, by its very terms, the primary purpose of the certificate of beneficial interest was to put the tribe on record as approving the final roll.

The certificate was signed by the chairman of the advisory council for the tribe because he was the highest elected official of the tribe. Furthermore, the transfer to the C. N. Committee of the certificate and its subsequent cancellation of the certificate were. in strict compliance with both the terms of the certificate and with the federal statute. Sec. 893 provided that the interests represented by the certificate could be "alienable" only in accordance with regulations adopted by the tribe. The tribe did adopt the plan calling for the transfer of tribal assets to the tribal corporation and trust.

The adoption of the plan "by the tribe" and its use as "the basis for the conveyance of the tribal property" were also authorized by the federal statute. (25 USC, 896, 897)

Plaintiffs' constitutional attack based on both the due process and equal protection clauses are also without merit. As stated before, the individual Menominees were not "shareholders" as that term is used in sec. 180.27, Stats., and consequently plaintiffs' argument that no other "shareholders" of a Wisconsin corporation could be made to enter into a voting trust without their individual written approval must fail for that reason. Plaintiffs' argument that the procedures here employed deprived them of their personal property without due process of law totally disregards the fact that the Termination Plan was approved by the tribe.

We conclude that the trial court's interlocutory judgment herein, to the extent that it held the Menominee common stock and voting trust to be valid was correct.

*Ambiguity of trust.*

Defendants contend that the trial court erred in declaring art. XII of the articles of incorporation of "MEI" ambiguous and, therefore, subject to judicial construction by resort to extrinsic evidence. The plaintiffs who, as to this issue, are respondents, support the determination of the trial court. All parties are in agreement that extrinsic evidence bearing on the intent of art. XII may only be resorted to once an instrument has been declared ambiguous in light of circumstances surrounding it at the time of its execution. *In re Fortwin Trust* (1973), 57 Wis. 2d 134, 203 N. W. 2d 711; *Estate of Breese* (1959), 7 Wis. 2d 422, 96 N. W. 2d 712. Art. XII in material part provides:

"Unless otherwise authorized by the *affirmative vote of the holders of not less than two-thirds of the outstanding shares of stock entitled to vote thereon,* the

corporation shall have no authority to sell, exchange, assign, convey or otherwise transfer all or any portion of the real property owned by the corporation: . . ." (Emphasis added.)

The *italicized* language in art. XII is the subject of dispute between the parties, as that language relates to "who" is entitled to vote on proposed sales of land to non-Menominees: the trustees of the voting trust or the individual enrolled Menominees. The trial court concluded that it was the intent of the Menominees in enacting art. XII that such power was to be retained by each enrolled Menominee. It first, however, declared art. XII ambiguous.

In regard to art. XII which along with the voting trust formed the very heart of the Termination Act itself, the trial court entered the following conclusions of law which were incorporated into the interlocutory judgment:

"3. Article XII of the Articles of Incorporation of Menominee Enterprises, Inc., requiring the 'affirmative vote of the holders of not less than two-thirds of the outstanding shares of stock entitled to vote' before the corporation may sell land to non-Menominees *is ambiguous as it relates to the period of time during which the Corporation's stock is held by the Voting Trust.*

"4. The seven conveyances of land made by Menominee Enterprises, Inc. to Lakes of the Menominees, a partnership, prior to the commencement of this action, *were made without the necessary approval required by Article XII of the Articles of Incorporation and were an improper exercise of the Corporation's power to convey land and are, therefore, invalid."* (Emphasis added.)

Although the written decision of the trial court does make reference to several of the provisions of the voting trust agreement, it is evident that the court in determining that individual Menominees and not trustees were authorized to approve land sales to non-Menominees, placed principle reliance on art. XII itself. We think the authorities are to the contrary.

"The powers and duties of the trustees are to be determined from the trust agreement as a whole, not reading one provision to nullify another and thus defeat the trust." 5 Fletcher, *Cyclopedia Corporations* (1967 rev.), ch. 14, p. 433, sec. 2091.1.

"Powers granted to the trustees by the trust instrument are rarely confined to voting at the election of directors; often their authority specifies the power to vote in all respects as could a full owner of shares, including the right to 'consent' to fundamental changes, increase or reduction of capital stock, sale of all assets, and liquidation of the corporation. The grant of power, however, must be explicit since the trustees are denied any power not clearly granted." 1 Hornstein, *Corporation Law and Practice* (1959), p. 298, sec. 212.

The question, therefore, is whether the voting trust agreement clearly grants authority to the trustees to sell land to non-Menominees. This court concludes that it does.

As prescribed by the Termination Plan, the powers of the trustees of the voting trust were spelled out in art. III of the voting trust as follows:

"III POWERS OF TRUSTEES 1. *The Trustees, in respect of the stock held by them hereunder, are hereby vested as owners of such stock (without limitation except as herein otherwise expressly provided) with all of the rights, powers, and privileges of every kind and character, of owners thereof, including, without limiting the generality of the foregoing (a) the right to vote the same, as hereinafter provided, for every purpose,* (b) the right to become parties to or prosecute or intervene in any suits or other legal or administrative proceedings affecting the stock deposited hereunder, the Company, or the powers, duties or obligations of the Trustees, and (c) the right to transfer all or any part of the Company's stock held hereunder into their names as Trustees or into the name "The Trustees of Menominee Common Stock and Voting Trust." (Emphasis added.)

General language at the beginning of art. III gives the trustees "all of the rights" of owners of the stock,

subject to certain exceptions not applicable to the present dispute, followed by the very specific language of sub. (a) which grants to them the right to vote the shares "for every purpose."

Although referring to this language contained in art. III, the trial court at no time tried to reconcile it with its conclusion of ambiguity. Art. III certainly is clear enough and broad enough to authorize the sale of land to non-Menominees. Other language in the trust agreement indicates that certificate holders did not have the right to vote on land sales to non-Menominees.

Art. IV requires the approval of two thirds of the certificate holders before the trustees are permitted to sell the stock. The absence of similar provisions requiring the approval of certificate holders for land sales implies that approval of the certificate holders was not required for land sales.

Art. X of the trust specifically provides that:

"1. The Trustees may construe this agreement, and their construction made in good faith shall be conclusive and binding upon the parties hereto, . . ."

Such a provision has been recognized in Wisconsin as being valid. *Estate of Koos* (1955), 269 Wis. 478, 492, 493, 69 N. W. 2d 598. As reflected in their vote to permit "MEI" to enter into the partnership agreement with Isaacson, the trustees construed the trust agreement when read on the whole to permit such authorization for land sales on their part. Similarly, the trial court's decision stated that "[n]o attack is made by anyone on the good motives of the trustees."

The trial court's conclusion and the plaintiffs' argument on appeal revolves around what all parties recognize to be the basic concept of this and other voting trusts; namely, that the trustees vote the shares which they hold as an undivided unit. Consequently, they argue that the words "holders of two thirds of the outstanding

shares" contained in art. XII becomes functionless when applied to the trustees since each has an interest in all of the shares. [In order to secure trustee approval under that provision, the board of directors of "MEI" must obtain a unanimous decision from all the trustees, else not one share will have been voted.] * This, however, will automatically include 100 percent of the shares and thus, it is impossible for the voting trustees to vote two thirds of the outstanding shares on any matter since individual trustees do not hold divisible amounts of stock. There is but one stock certificate representing this common trust and all the trustees hold all the stock. [All must agree or not one share can be voted in approval of land sales. It is undisputed that the voting trustees unanimously approved land sales to non-Menominees.] *

As already pointed out, the holders of the shares during the existence of the voting trust were the voting trustees. While it is true that the language contained in art. XII may have no effect while the trust is still in existence and while the shares are being voted as a unit by the trustees, it will have a clear and unambiguous meaning after the trust no longer exists; an eventuality which was within the contemplation of all of the parties at the time the plan was adopted.

We conclude that the trial court in holding art. XII of the articles of incorporation ambiguous was in error.

*Conveyance of land from "MEI" to "LOM."*

In a supplemental decision, occasioned by orders to show cause brought by the defendants, the trial court held that certain lands conveyed to "LOM" by the approval of the trustees and which were subject to the plaintiffs' lis pendens, could be enjoined from further sale in spite of the rule that an executed conveyance,

---

* Clarified in memorandum opinion on motion for rehearing, post, p. 28a.

even though made in an irregular manner, will not ordinarily be upset because of the irregularity. The court's ruling was clearly premised on its belief that art. XII was ambiguous and that only enrolled Menominees could authorize the sale of land to non-Menominees.

Since the trial court was in error on its original premises, it was likewise in error to enjoin the sale of land held by "LOM."

*By the Court.*—That part of the interlocutory judgment which held the voting trust valid is affirmed. Those parts of the judgment which held art. XII of the articles of incorporation ambiguous; which interpreted that only enrolled Menominees could approve land sales to non-Menominees; and which enjoined the future sale of the land held by "LOM" are reversed.

The following memorandum was filed on August 14, 1973.

PER CURIAM (on motion for rehearing). It is urged that the opinion of the court, in connection with the number of trustees necessary to cast a vote, can be construed to mean that there must be a unanimous agreement of all the trustees of the voting trust to vote the stock they hold. If this construction can be drawn from the opinion, it is withdrawn. As noted in the opinion, the trust agreement in the plan provided the trust could act upon the affirmative vote of five of the seven trustees. This provision of the trust agreement was subsequently amended to provide an affirmative vote of seven trustees was required. This was done to accommodate this same amendment which increased the number of trustees from seven to eleven. Thus, as the trust agreement now provides, seven affirmative votes of the eleven trustees are sufficient to vote the entire stock held by the voting trust to approve the sale of land to non-Menominees.

Motion denied without costs.