VAN CAMP and wife, for themselves and for the benefit of all other persons whom they represent, Respondents, v. MENOMINEE ENTERPRISES, INC., Appellant.*

*No. 442. Argued April 7, 1975.—Decided May 6, 1975.*
(Also reported in 228 N. W. 2d 664.)

---

* Motion for rehearing denied, without costs, on June 30, 1975.

For the appellant there were briefs by *Mary Van Gemert* and *Preloznik & Merriam* and a reply brief by *Joseph F. Preloznik, Steven A. Felsenthal* and *Preloznik & Fredrickson, S. C.*, all of Madison, and oral argument by *Joseph F. Preloznik*.

For the respondents there was a brief and oral argument by *Vance M. Waggoner* of Reedsburg.

BEILFUSS, J. This is a class action arising out of transactions with non-Menominee Indians relating to the Legend Lake real estate development project. This project was the subject of this court's decision in *Tomow v. N. E. Isaacson & Associates, Inc.* (1973), 60 Wis. 2d 1, 208 N. W. 2d 824, certiorari denied, 414 U. S. 1137, 94 Sup. Ct. 883, 38 L. Ed. 2d 763. The pertinent historical facts are set forth in that decision and will not be repeated in detail here. More specifically, this case involves the claimed rights of certain non-Menominee purchasers of property within the project boundaries to hunt and fish on the other land owned by the appellant Menominee Enterprises, Inc. (MEI), a Wisconsin corporation.

Under the terms of the 1854 Treaty of Wolf River, 10 U. S. Stat. at L., p. 1064, in exchange for other lands previously claimed and held by the Menominee Indians, the United States granted to them certain lands, the bulk of which comprised what is now Menominee county "to be held as Indian lands are held." This land is approximately 234,000 acres.

In 1961, pursuant to the Menominee Termination Act,[1] federal supervision over the Menominees' affairs and

---

[1] 68 U. S. Stat. at L., p. 250, as amended, 70 U. S. Stat. at L., p. 549, 72 U. S. Stat. at L., p. 290, 74 U. S. Stat. at L., p. 867; 25 USC, secs. 891–902, passed originally by the Congress in 1954, became effective by the Secretary of Interior's proclamation of

property was discontinued, and the Secretary of the Interior was authorized "to transfer to the tribal corporation . . . the title to all property, real and personal, held in trust by the United States for the tribe." 25 USCA, p. 725, sec. 897. MEI is the corporation formed to receive, hold, manage and operate such property. MEI is owned by Menominee common stock and voting trust which is, in turn, owned by the members of the Menominee tribe.

A "Termination Plan," approved by the Secretary of the Interior as part of the overall Termination Act, provided that no more than 14,500 acres (without amendment of the articles) could be set aside to be sold to individual Menominees and non-Menominees. It further provided that in order to achieve economic self-sufficiency the recreational resources be developed by creation of several larger lakes from smaller ones and that cottage sites be developed around them.

On July 9, 1968, MEI entered into a partnership agreement with N. E. Isaacson & Associates, Inc., to form a joint venture known as "Lakes of the Menominees" (LOM), "for the purpose of developing and marketing certain lands situated in Menominee county, Wisconsin" owned by MEI. During the period between September 12, 1968, and April 1, 1971, MEI conveyed about 5,170 acres of land to LOM by warranty deeds. MEI received $150 per acre for the conveyance, or $775,500. Prior to dissolution of LOM on about June 30, 1972, MEI had received about $1,250,000 through its interest in LOM, over and above the cost of the land conveyed.

One of the developed lots sold by LOM was purchased by the plaintiffs-respondents Cyril F. Van Camp and his wife. In the Offer to Purchase accepted May 16, 1970, LOM made the following representation:

---

April 29, 1961, 26 Fed. Reg., No. 82, April 29, 1961, at page 3726, repealed by Pub. L. 93–197, 87 U. S. Stat. at L., p. 770 on December 22, 1973, as a federally recognized sovereign tribe.

"That buyers will receive personal and non-assignable hunting and fishing privileges on Menominee County lands.

"The warranty and representation made herein survive the closing of this transaction."

The actual conveyance was accomplished by warranty deed executed June 15, 1970. The deed makes no mention of hunting and fishing privileges. At the real estate closing, respondent Cyril F. Van Camp was issued an identification card signed by George W. Kenote, vice-president of MEI, and a salesman for LOM, which provides as follows:

"This will identify Cyril F. Van Camp, Lot 79 in Brave Island Addition to Legend Lake as a property owner in Menominee County and extends Hunting and Fishing Privileges on all company property. State Laws and Regulations and Local Rules must be observed."

The card bears, along the side, the inscription "Menominee Enterprises Inc." along with MEI's logogram.

The plaintiff-respondent Van Camp stated by affidavit that since purchasing his property he frequently hunted and fished on MEI land and, when on occasion he was stopped by authorities, upon displaying his Wisconsin license and his MEI identification card he was permitted to continue hunting or fishing.

On July 17, 1970, the board of directors of MEI unanimously adopted the following motion:

". . . that lands owned by Menominee Enterprises, Inc. shall be closed to hunting and fishing activities of Lakes of Menominees lake lot purchasers effective August 1, 1970, for sales made on and after that date; that this cut-off date is established in order to allow the Lakes of the Menominees project sufficient time to effect the necessary changes in their sale program; further, that it is not the intent that this shall affect sales made prior to August 1, 1970."

Prior to August 1, 1970, every offer to purchase Legend Lake property contained a representation as to

hunting and fishing rights identical to that contained in respondents' offer; subsequent to that date the language was deleted.

On March 9, 1973, respondents received a letter from MEI informing them as follows:

"This is notice that the Board of Directors of Menominee Enterprises, Inc., at their meeting of August 18, 1972, affirmed their position that all access permits to lands owned by Menominee Enterprises, Inc. for the purpose of hunting or fishing shall be declared invalid. Management has been instructed to pick up all such permits and our personnel have been instructed not to recognize any authority purportedly conveyed thereunder by the named holder of such card. Therefore, effective November 17, 1972, any 'permit' that you may have in your possession will not be recognized as a bona fide access permit to enter upon or over lands owned by Menominee Enterprises, Inc. All of our lands will be posted for 'No Trespass'.

"The Board of Directors base their directive, in part, on recognition that the fishing, hunting and trapping are exhausting the natural resources of the area without adequate fish, game or wildlife management for the preservation of the species by reasonable restocking.

"Menominee Enterprises, Inc., personnel have been instructed and authorized to take whatever steps are necessary to prevent and prohibit encroachment on their lands."

This action was commenced on April 10, 1973. In their amended complaint, the Van Camps alleged that they were bringing the suit for themselves and as representatives of the class of purchasers, about 900 in number, who bought property from LOM prior to August 1, 1970. The complaint sought temporary and permanent injunctions enjoining MEI and its agents from "rescinding, revoking, restricting or in any way interfering with the hunting and fishing privileges warranted and represented."

MEI, in its answer to the amended complaint, alleged that MEI was without authority to convey hunting and

fishing rights, that LOM was without authority to convey such rights, and that in fact such rights were never conveyed.

We are dealing here with all the Menominee county land owned by MEI, not just the parcels conveyed to others.

MEI moved for summary judgment. Extensive affidavits, exhibits and briefs were filed and on September 13, 1973, the court issued an order denying the motion of MEI and granted summary judgment for the Van Camps.[2] Such order permanently enjoined MEI and its agents from "rescinding, revoking, restricting or in any way interfering with the hunting and fishing privileges warranted and represented to Plaintiffs and all other persons whom they represent, by contracts entered into prior to August 1, 1970."

MEI appeals.

The trial court held that this is a proper class action. This determination is not challenged in any manner in this appeal and will not be further considered.

The appellant MEI asserts that the Treaty of 1854 between the Menominee tribe and the United States guaranteed to the Menominee tribe the exclusive right to hunt and fish upon the Wolf River reservation, which includes all the land in question. This assertion is correct as determined in *State v. Sanapaw* (1963), 21 Wis. 2d 377, 383, 124 N. W. 2d 41, certiorari denied, 377 U. S. 991, 84 Sup. Ct. 1911, 12 L. Ed. 2d 1044, rehearing denied, 379 U. S. 871, 85 Sup. Ct. 17, 13 L. Ed. 2d 78, and *Menominee Tribe v. United States* (1968), 391 U. S. 404, 406, 88 Sup. Ct. 1705, 20 L. Ed. 2d 697.

---

[2] Although the Van Camps had not moved for summary judgment, the trial court was authorized to grant it in their favor by virtue of sec. 270.635 (3), Stats.: "Upon motion by a defendant, if it shall appear to the court that the plaintiff is entitled to a summary judgment, it may be awarded to him even though he has not moved therefor."

MEI further contends that the tribe never relinquished such rights and that when, pursuant to the Termination Act, the United States conveyed title to the land to MEI it did not and could not convey the hunting and fishing rights. MEI now argues it was never capable of transferring such rights to LOM who, in turn, was likewise powerless to transfer them to the respondents.

The respondents' only reply to this argument is that the conduct of MEI indicates a contrary conclusion because the corporation leases out portions of its lands to the state of Wisconsin for public recreational purposes, including hunting and fishing. While this argument may be lacking in legal authority, it does bear scrutiny. MEI asserted at oral argument that it does not question the right of the respondents to hunt and fish on the property they purchased, but only argues that they have no right to do so on the entire balance of land owned by the corporation. However, by analogy to the respondents' argument, it must be noted that if MEI is correct in its contention that the tribe never relinquished its hunting and fishing rights in the property to the extent the corporation was without authority to convey them, the inescapable conclusion is that the tribe retained such rights even as to the land sold and, because such rights are allegedly exclusive, the respondents do not have the right to hunt and fish on their own property. This conclusion is inconsistent with the position now taken by MEI.

*Menominee Tribe v. United States, supra,* which held that the Termination Act and subsequent transfer of title to MEI did not abrogate the hunting and fishing rights of the Indians, offers little help in the resolution of this issue. As stated by the United States Supreme Court at page 409, footnote 10:

"Wisconsin questions whether Menominee Enterprises, Inc., to which all tribal assets were conveyed pursuant to the termination plan (26 Fed. Reg. 3726), should be viewed as the successor entity to the tribe and the present

holder of the hunting and fishing rights, and, if so, to what extent the corporation or the tribal members thereof can withhold or parcel out these rights.

"The Menominees, on the other hand, claim the rights are held by Menominee Indian Tribe of Wisconsin, Inc., a tribal body organized in 1962. . . .

"We believe it inappropriate, however, to resolve the question of who the beneficiaries of the hunting and fishing rights may be; and we expressly reserve decision on it. . . ."

We believe the issue must be resolved in favor of the respondents.

Sec. 3 of the Termination Act provides that at midnight of June 17, 1954, the membership roll of the Menominee tribe was to be closed. Upon expiration of the time for appeal the Secretary of the Interior was to publish in the Federal Register a Proclamation of Final Closure of the roll.

"Effective upon the date of such proclamation, the rights or beneficial interests of each person whose name appears on the roll shall constitute personal property and shall be evidenced by a certificate of beneficial interest which shall be issued by the tribe. . . . Such interests shall be alienable only in accordance with such regulations as may be adopted by the tribe." 68 U. S. Stat. at L., p. 251; 25 USCA, sec. 893.

The Certificate was executed on June 17, 1954, and provides in substance and in part: That the enrolled Tribal Members are the holders of an individual equal share of the Certificate of Beneficial Interest which evidences the rights and interests of each such person "to all property, real and personal, now and hereafter, legally or beneficially owned by the Menominee Indian Tribe." It was required that the Certificate be delivered to the Coordinating and Negotiating Committee on behalf of the Tribal Members. The Certificate further provided the committee shall cancel the Certificate in accordance with

the terms and provisions of the " 'Plan for the Future Control of Menominee Indian Tribal Property and Future Service Functions,' " which is the basis and authority for the conveyance of the Menominee Indian tribal property.[3]

The scope of the Certificate is such that in our opinion whatever hunting and fishing rights the tribe possessed on the reservation property were incorporated into the Certificate.

In *Tomow, supra,* pages 23, 24, this court held that pursuant to the Termination Plan [4] the Certificate was properly issued and cancelled in exchange for MEI stock by the Menominee Coordinating and Negotiating Committee, which was created by the general council of the tribe, its traditional ruling body composed of all adult members, to formulate a termination plan. It was also held that the entire procedure, which transferred all tribal assets to the corporation, was approved and adopted by the tribe pursuant to federal statute, and that therefore any claim that the tribe was deprived of its property without due process is without merit.

*Tomow* upheld the right of MEI to transfer real estate. With respect to the issue at hand, we conclude that MEI, by virtue of the cancellation of the certificate of beneficial interest, not only obtained the right to transfer title and possession to the property, but also the right to grant hunting and fishing privileges. When the certificate of beneficial interest was cancelled, the tribal members relinquished their exclusive hunting and fishing rights to MEI.

MEI next contends that even if it acquired the hunting and fishing rights, it did not effectively transfer them because: (1) There was never any writing conveying such

---

[3] 26 Fed. Reg., No. 82, April 29, 1961, at p. 3754, and *Tomow v. N. E. Isaacson & Associates, Inc., supra,* page 22.

[4] 26 Fed. Reg., No. 82, April 29, 1961, at p. 3728.

rights as required by the statute of frauds, and (2) there was never shareholder approval to convey such rights as required by MEI's Articles of Incorporation.

Sec. 240.06, Stats. 1969,[5] provides in part:

"No estate or interest in lands . . . shall be created, granted, assigned, surrendered or declared unless by act or operation of law or by deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same or by his lawful agent thereunto authorized by writing."

Because there is no written deed or conveyance purporting to transfer the hunting and fishing rights to LOM, the statute was not satisfied if the rights involved constitute an "estate or interest in lands."

Art. XII of MEI's Articles of Incorporation provides in part:

"Unless otherwise authorized by the affirmative vote of the holders of not less than two-thirds of the outstanding shares of stock entitled to vote thereon, the corporation shall have no authority to sell, exchange, assign, convey or otherwise transfer all or any portion of the real property owned by the corporation; . . ."

Although, as held in *Tomow, supra,* there was requisite shareholder approval for the sale by MEI of limited acreage of LOM, it is uncontroverted on this appeal that there was no such approval for the transfer of hunting or fishing rights on the balance of the land held by MEI. Since such transfer can be made "unless otherwise provided in the articles of incorporation," sec. 180.71 (1), Stats. 1969, the question is whether the hunting and fishing rights constitute "real property" within the meaning of art. XII.

MEI argues that the hunting and fishing privileges constitute an easement or a profit a prendre and are thus

[5] Repealed by Laws of 1969, ch. 285, sec. 21, effective July 1, 1971.

an "estate or interest in lands" or "real property" within the meaning of sec. 240.06, Stats. 1969, and art. XII. The respondents contend, on the other hand, that the hunting and fishing privileges were a mere license and as such do not constitute an "estate or interest in lands" or "real property."

The specific rights here involved, as described in the Offer to Purchase, are "personal and non-assignable hunting and fishing privileges."

The commentators are in accord that such a right is a profit a prendre and, as such, an interest in real property.

". . . a grant of a right to take and kill game on land or waters belonging to the grantor is a grant of an interest in the land itself within the Statute of Frauds. It is a grant of a profit a prendre. The cases are uniform in holding that a shooting privilege is a profit a prendre." 1 Thompson, *Real Property* (1964 Replacement), p. 513, sec. 135.

"A profit à prendre involves primarily a power to acquire, by severance or removal from another's land, some thing or things previously constituting a part of the land, or appertaining thereto . . . . As instances of profits à prendre may be mentioned rights to take from another's land . . . wood, herbage, or coal or other minerals . . . . Likewise, one may have the right to kill and take game on another's land, fish in waters thereon, to take seaweed cast thereon, or soil, sand and gravel therein. . . ." 3 Tiffany, *Real Property* (3d ed.), pp. 427, 428, sec. 839.

". . . Since the grant of such a right involves a transfer of an interest in land, it must be created by writing . . . . An attempted grant of a profit à prendre, if invalid as being merely oral . . . creates a license merely, which may be revoked at any time. . . ." *Id.* p. 432, sec. 842.

"A profit, sometimes called a 'profit a prendre,' is a nonpossessory interest in land consisting of a right to take the soil or a substance of the soil, such as a right to take minerals, drill for oil or take wild game or fish."

Burby, *Real Property,* p. 62, sec. 22 (hornbook series 3d ed.).

We conclude, therefore, that the hunting and fishing rights do constitute an interest in land and, as such, were not successfully transferred by MEI to the respondents in light of sec. 240.06, Stats. 1969, and art. XII.

If, as the respondents contend, the hunting and fishing rights were a license which do not qualify as an interest in real property, they would be in no better position because a license, by its very nature, is revocable at the will of the grantor even when given for good consideration,[6] with some exemptions not relevant here.

In *Schwartz v. Evangelical Deaconess Society* (1970), 46 Wis. 2d 432, 438, 175 N. W. 2d 225, the court adopted the following definition:

> " 'A license in real property is defined as a personal, revocable, and unassignable privilege, conferred either by writing or parol, to do one or more acts on land without possessing any interest therein. Indeed, the distinguishing characteristics of a license in land are that it gives no interest in the land and that it may rest in parol. . . .' "

As stated in 1A Thompson, *Real Property* (1964 Replacement), p. 190, sec. 215:

> "A license, while affording justification for what is done under it while it remains in effect, is not effective to pass an interest in real property. If anything more than a revocable license is created it is an easement or interest in the land, which would be within the Statute of Frauds . . . ."[7]

We express no opinion as to any contractual rights the respondents may have by virtue of the acceptance of LOM of the Offer to Purchase either at law or in equity for the reason the complaint sought only injunctive relief.

---

[6] *Chynoweth v. Tenney* (1860), 10 Wis. 341, 352 (*397, *409); *Duinneen v. Rich* (1868), 22 Wis. 524, 526 (*550, *552); *Thoemke v. Fiedler* (1895), 91 Wis. 386, 390, 64 N. W. 1030.

[7] *See also: Chynoweth v. Tenney, supra,* pp. 352, 353 (*409, *410).

All of the necessary facts appear undisputed in the affidavits in support of or in opposition to the motion for summary judgment and therefore the question of the right to injunctive relief can be determined upon a motion for summary judgment.

In light of our conclusions set forth above, we hold the trial court was in error in denying the motion of MEI for summary judgment and in granting summary judgment for the respondents.

*By the Court.*—Order denying motion for summary judgment for the appellant MEI is reversed. The order granting summary judgment for the plaintiffs-respondents is reversed and set aside. The case is remanded with directions to grant the motion for summary judgment by the appellant MEI.

The following opinion was filed June 30, 1975:

PER CURIAM *(on motion for rehearing).* The motion for rehearing is denied without costs. However, to dispel widespread public misapprehension, we hasten to point out that our opinion in this case in no way prohibits fishing by non-Menominees on navigable waters within MEI land.