**MENOMINEE INDIAN TRIBE OF WISCONSIN, Plaintiff,**

v.

**Tommy G. THOMPSON, Governor of the State of Wisconsin; George E. Meyer, Secretary, Wisconsin Department of Natural Resources; James T. Addis, Administrator of DNR Division of Resource Management; John E. Fryatt, Administrator of DNR Division of Enforcement; Herbert F. Behnke, Trygbe A. Solberg, Neal W. Schneider, Betty Jo Nelsen, Mary Jane Nelson, James E. Tiefenthaler, Jr. and Stephen D. Willett, Members of the Wisconsin Natural Resource Board, Defendants.**

**No. 95–C–30–C.**

United States District Court, W.D. Wisconsin.

Sept. 16, 1996.

1000

1002

Bruce R. Greene, Greene, Meyer & McElroy, P.C., Boulder, CO, for Menominee Indian Tribe of Wisconsin.

Charles D. Hoornstra, Asst. Atty. General, Madison, WI, for Defendants, State of Wisconsin, Wisconsin Natural Resources Bd., George E. Meyer, James T. Addis, John E. Fryatt, Tommy G. Thompson, Herbert F. Behnke, Trygbe A. Solberg, Neal W. Schneider, Betty Jo Nelsen, Mary Jane Nelson, James E. Tiefenthaler, Jr., Stephen D. Willett.

Paul M. Erspamer, Jastroch & La Barge, S.C., Waukesha, WI, for Lorman Anderson, Haze Diemel, Eureka Dam Campsite, Inc., Daniel F. Groeschel, Linda Wendt, Sturgeon for Tomorrow, Inc., Walleyes for Tomorrow, Inc., Wis. Fed. of Great Lakes Sport FIS.

Charles G. Curtis, Foley & Lardner, Madison, WI, for Wisconsin Paper Council, P.H. Glatfelter, Riverside Paper, Wisconsin Tissue Mills.

Kevin E. O'Neill, Milwaukee, WI, for Wisconsin Commercial Fish. (INTV).

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action in which plaintiff Menominee Indian Tribe of Wisconsin seeks declaratory and injunctive relief, asserting that it enjoys off-reservation rights to hunt, fish and gather without state restriction on the lands it ceded to the United States in 1831, 1836 and 1848 and that it has unextinguished aboriginal rights, derived from long uninterrupted use, to hunt and fish in various Wisconsin waters, including Lakes Winnebago and Michigan, the bay of Green Bay and portions of the Wisconsin River. In an opinion and order entered February 26, 1996, I considered defendants' motion to dismiss plaintiff's complaint on the grounds of failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), judicial estoppel and issue and claim preclusion. I granted the motion with respect to plaintiff's claim that it was entitled to harvest Wolf River sturgeon in off-reservation, downstream portions of the Wolf River/Lake Winnebago ecosystem and denied the motion in all other respects. *See Menominee Indian Tribe of Wisconsin v. Thompson*, 922 F.Supp. 184 (W.D.Wis.1996).

Although I permitted plaintiff to proceed on its remaining claims, I noted that it was a close question whether plaintiff's allegations of fact were sufficient to support its claims. *Id.* at 198. Plaintiff did not explain in its complaint why the Menominee had a different understanding of the apparently clear language of the treaties at the time it entered into them and why the treaty language did not terminate the usufructuary rights that it is claiming now. *Id.* at 216. Instead,

plaintiff took the position that it would be unable to make this explanation until its experts had completed their review of "hundreds of documents" surrounding the treaty negotiations and had formulated their opinions about the meaning of the treaties and the tribe's understanding. Pl.'s Brief, dkt. # 25, at 25. Knowing that plaintiff had already had many months in which to formulate its theory of the case and, under Fed. R.Civ.P. 11, had an obligation to do so before filing its lawsuit, and recognizing the expense and inefficiency of proceeding with the case if plaintiff could not come forward with allegations of fact that would support its claims, I suggested that defendants submit contention interrogatories to plaintiff to flesh out the factual basis of the claims. *Id.* at 200. The contention interrogatories were not intended to require plaintiff to set forth the entire array of facts necessary to support its claims but merely to prod plaintiff to provide the factual allegations required to give the court and defendants an idea of the basic theory of its case.

On March 7, 1996, defendants filed a motion to reconsider the February 26 order with respect to the issue of judicial estoppel, or in the alternative to amend to allow for interlocutory appeal on that issue. On March 22, 1996, a hearing was held to consider defendants' motion, after which plaintiff was given 30 days to answer defendants' contention interrogatories. After plaintiff responded to these interrogatories, defendants filed a renewed motion for reconsideration of all aspects of the February 26 order, this time focusing on plaintiff's answers to the interrogatories and contending that plaintiff had failed to provide sufficient allegations of fact in support of its claims. The two motions (defendants' March 7 motion (dkt. # 59) and June 4 renewed motion (dkt. # 78)) will be considered as two parts of a single motion to dismiss. In addition, the motion of the Wisconsin Paper Council to file and serve a reply brief in its role as amicus will be granted.

■ In addition to their motion for reconsideration, defendants have asked the court to take judicial notice of a letter of September 14, 1848 from Acting Secretary of War J. Mason to Commissioner W. Medill. *See* dkt. # 81. Because this document is unnecessary to the resolution of this case, I will deny the motion. However, I will take judicial notice of a number of other historical documents that help to clarify events surrounding the signing of the treaties at issue. Doing so accords with the rule that courts may take judicial notice of incontrovertible facts from documentary materials whose authenticity is not in question. *See Oneida Indian Nation of New York v. New York*, 691 F.2d 1070, 1086 (2d Cir.1982) (citing J. Moore, 10 *Moore's Federal Practice*, § 201.20), *cert. denied*, 493 U.S. 871, 110 S.Ct. 200, 107 L.Ed.2d 154 (1989). Plaintiff acknowledges the likelihood that "there will be no dispute as to the authenticity of a vast majority [of the documents], perhaps all of them," *see* Pl.'s Brief, dkt. # 91, at 17, but objects to the court's use of the documents at this time because of disputes that might arise after its experts have had time to review them. If plaintiff believed that disputes might arise later concerning the authenticity of the documents or the accuracy of the information contained within them, it should have pointed out where such disagreements might arise. Plaintiff suggests also that "the documents cannot speak for themselves" without the benefit of expert interpretation, *id.* at 15, but I disagree. Expert testimony is not needed to interpret these documents. *See Sokaogon Chippewa Community v. Exxon Corp.*, 805 F.Supp. 680, 711 (E.D.Wis. 1992), *aff'd*, 2 F.3d 219 (7th Cir.1993) (court is equipped to interpret treaties and letters written by lay persons in colloquial terms without expert testimony), *cert. denied*, 510 U.S. 1196, 114 S.Ct. 1304, 127 L.Ed.2d 655 (1994).

■ Even if the materials in question were not subject to judicial notice, it would be permissible to refer to them if doing so would help explain how the plaintiff might be able to support its claim. *See, e.g., Orthmann v. Apple River Campground, Inc.*, 757 F.2d 909, 914–15 (7th Cir.1985) (in reviewing lower court's grant of motion to dismiss for

failure to state a claim, court could consider materials not of record "to show how accident might have happened"; plaintiff is free to give court unsubstantiated version of facts, so long as it is not inconsistent with the allegations of complaint, in order to show that dismissal is improper).

■ Accordingly, the historical documents submitted by the parties will be used and cited as necessary throughout the opinion. Consideration of such judicially noticeable documents does not convert this motion to one for summary judgment under Fed.Rule Civ.P. 56. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir.1991); *Mandarino v. Pollard*, 718 F.2d 845, 849 (7th Cir.1983), *cert. denied*, 469 U.S. 830, 105 S.Ct. 116, 83 L.Ed.2d 59 (1984); *Dobiecki v. Palacios*, 829 F.Supp. 229, 232 (N.D.Ill.1993).

Plaintiff contends that defendants' motion should be considered as a request for judgment on the pleadings pursuant to Fed. R.Civ.P. 12(c) rather than as a Fed.R.Civ.P. 12(b)(6) motion because it was filed after defendants had answered the complaint, but plaintiff has not shown any reason for preferring one rule over the other. As plaintiff admits, the standards to be applied are essentially the same. The only real difference is that on a 12(c) motion the court is to consider the answer as well as the complaint. Accordingly, I will treat defendants' motions under Rule 12(c), but will draw amply from standards applicable to Rule 12(b)(6).

Plaintiff is correct that it is under no obligation at this stage of the litigation to *prove* facts in support of its claims. In contesting defendants' motions to dismiss, plaintiff may allege facts that would support its claims and the court must accept such allegations as true. Even so, plaintiff must still tie its factual allegations to specific treaty language, showing why, in light of the factual allegations, that language can be read to support its views.

After examining plaintiff's answers to the contention interrogatories and accompanying materials, the judicially noticeable documents and the relevant treaties, I am persuaded that even under the liberal standards of Fed. R.Civ.P. 12, plaintiff's allegations are insufficient to support its claims. Although plaintiff has added factual allegations concerning its understanding of the relevant treaties, it is still unable to show that its understandings are supported by any language in the texts of the treaties. More important, if there is any doubt about plaintiff's loss of its usufructuary rights under the 1831 treaty, it is now clear that plaintiff's 1848 obligatory removal treaty extinguished all plaintiff's usufructuary rights in Wisconsin lands and waters. Any uncertainty about the effect of the 1848 treaty expressed in the last opinion, *see Menominee Indian Tribe,* 922 F.Supp. at 202–203, has been clarified by the judicially noticeable documents and a closer examination of the 1848 treaty language. Moreover, plaintiff's litigation in the state and federal courts, where it has sued over the years to recover damages for lost lands and usufructuary privileges, suggests strongly that plaintiff has understood all along that it gave up any permanent claim to off-reservation hunting, fishing and gathering rights when it signed the 1831 treaty.

■ Contrary to plaintiff's assertions, the law of the case doctrine does not preclude a court from reanalyzing determinations reached in an earlier opinion. *See Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir.1995) (doctrine of law of the case is a presumption, not a straitjacket). Judges may examine their own previous rulings, if they are convinced that the earlier ruling was wrong and if rescinding it would not cause undue harm to any party. *Id.* (citing *Arizona v. California*, 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 1391 n. 8, 75 L.Ed.2d 318 (1983)). Plaintiff has not shown that it has relied to its prejudice on the earlier ruling.

## OPINION

### I. PROCEDURAL STANDARDS AND CANONS OF CONSTRUCTION

■ The Federal Rules of Civil Procedure provide for a system of notice pleading pursuant to Rule 8, which requires only that the plaintiff set out a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

"The primary purpose of [Rule 8] is rooted in fair notice: under Rule 8, a complaint 'must be presented with intelligibility sufficient for a court or opposing party to understand whether a valid claim is alleged and if so what it is.'" *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 775 (7th Cir.1994) (citations omitted). In light of this liberal standard, a plaintiff can resist a 12(b)(6) motion to dismiss by setting out facts sufficient to outline the basis of its claim. *Panaras v. Liquid Carbonic Industries Corp.*, 74 F.3d 786, 792 (7th Cir.1996); *see also Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (motion to dismiss should be granted only if "it appears beyond doubt that [the plaintiff] can prove no set of facts in support of his claim which would entitle him to relief"); *Hrubec v. National R.R. Passenger Corp.*, 981 F.2d 962, 963 (7th Cir.1992) ("A complaint need not narrate all relevant facts or recite the law; all it has to do is set out a claim for relief.") (citations omitted); *Redfield v. Continental Casualty Corp.*, 818 F.2d 596, 605 (7th Cir.1987) (a plaintiff need not set out in detail the facts upon which his claim is based). Plaintiffs do not even need to plead facts, they can plead conclusions and then, when faced with a Rule 12 motion to dismiss, hypothesize facts that if proved would establish those conclusions. *Early v. Bankers Life & Casualty Co.*, 959 F.2d 75, 79 (7th Cir.1992); *ACLU Foundation of Southern California v. Barr*, 952 F.2d 457, 467 (D.C.Cir.1991) (motion to dismiss is not tool for testing truth of allegations or for determining whether plaintiff has evidence to back up those allegations).

■ However, even the liberal notice pleading standards have their limits. If there is no "reasonable prospect" that the plaintiff can make out a valid claim from the facts narrated in the complaint, the court should grant the motion to dismiss. *Sutliff, Inc. v. Donovan Companies, Inc.*, 727 F.2d 648, 654 (7th Cir.1984); *see also Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1430 (7th Cir.1993) (plaintiff may not "fumble around searching for a meritorious claim within the elastic boundaries of a barebones complaint"); *Matter of Wade*, 969 F.2d 241, 249 (7th Cir.1992) (inferences plaintiffs asked

court to draw from alleged facts were not reasonable), *cert. denied*, 510 U.S. 870, 114 S.Ct. 195, 126 L.Ed.2d 153 (1993); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1368 at 525 (1990) (inferences drawn in favor of non-moving party must be reasonable and "cannot be indulged in when they are contrary to the clear and unambiguous words or actions of the parties or inconsistent with matters that fall within the judicial notice doctrine"). Plaintiffs have a responsibility to include allegations of fact sufficient to establish the crucial elements of their claims. *Forest County Potawatomi Community v. Doyle*, 828 F.Supp. 1401, 1405 (W.D.Wis.1993), *aff'd*, 45 F.3d 1079 (7th Cir.1995). If they file complaints that assert legal conclusions without making adequate factual allegations to support those conclusions, their complaints may be dismissed on Rule 12 grounds. *Panaras*, 74 F.3d at 792; *Strauss v. City of Chicago*, 760 F.2d 765, 767–68 (7th Cir.1985). The same rules apply to cases involving treaty interpretation. Although many such cases do not lend themselves to resolution at the motion to dismiss stage, there is no reason not to resolve a case involving a treaty at this stage if the only issues are ones of law or if plaintiffs have not alleged facts sufficient to state a claim. *Menominee Indian Tribe*, 922 F.Supp. at 197 (citing cases).

■ Defendants contend that plaintiff has failed to provide even the minimal factual allegations necessary to survive a 12(c) motion. Although plaintiff has made numerous factual allegations in its answers to defendants' contention interrogatories, those allegations do not dictate plaintiff's success on this motion. Plaintiff cannot survive a 12(c) motion by alleging that it understood the treaties to mean something wholly inconsistent with the treaty's language without explaining how its understanding is supported by language in the treaties. *See Oneida Indian Nation*, 691 F.2d at 1096 (to survive a motion to dismiss plaintiff must allege facts from which it could reasonably be inferred that parties' agreement meant what plaintiff says it meant). The Court of Appeals for the Seventh Circuit has held that "[a] court need not accept as true a plaintiff's allegations

concerning the meaning of an unambiguous contract." *Hoosier Energy Rural Elec. Coop. v. Amoco Tax Leasing IV Corp.*, 34 F.3d 1310, 1318 (7th Cir.1994). Its admonition is equally applicable to treaties.

■ I noted in the February 26, 1996 opinion and order that caution is warranted when determining whether treaty language is ambiguous. *See Menominee Indian Tribe*, 922 F.Supp. at 199. Modern readers may think language is clear when the parties to the treaty had a very different understanding of that same language. In determining treaty ambiguity, it is necessary to take careful consideration of the historical context to ascertain that the modern interpretation of the language gives effect to the true intentions of the parties. It is not entirely true to say, as defendants do, that extrinsic evidence can never be introduced to establish the ambiguity of contractual terms. Although that is the general rule, there is an exception for contracts whose language appears clear at the literal level but would not be so to someone knowledgeable about the particular subject matter. *See, e.g., United States v. National Steel Corp.*, 75 F.3d 1146, 1149 (7th Cir.1996) (defining "intrinsic" ambiguity (ambiguity apparent to anyone reading contract) and "extrinsic" ambiguity (ambiguity apparent only to persons who know something about the subject matter)); *Bristow v. Drake Street Inc.*, 41 F.3d 345, 351–52 (7th Cir.1994) ("Words in common usage may also bear technical meanings unknown to judges or juries unenlightened by testimony; and contractual language may be 'clear on its face' only because the outsider, the generalist, is unaware of understandings among insiders so deep that the need to express them is not felt.") It is possible that the treaties at issue include language that seems clear on its face to twentieth century readers but would have conveyed a different, ambiguous meaning to a person reading the same words in the early to mid-nineteenth century. That this is a possibility, however, does not relieve plaintiff of the obligation of identifying any latent or extrinsic ambiguities.

Although the treaties in this case "are not models of clarity or good draftsmanship," *id.*, their language indicates that plaintiff's claims are foreclosed. Plaintiff has failed to show otherwise, although it had a second opportunity to show that its claims were viable after I denied most of defendants' first motion to dismiss and suggested that defendants file contention interrogatories to determine which treaty provisions plaintiffs believed gave support to their claims. *See Sperling v. Hoffmann–La Roche, Inc.*, 924 F.Supp. 1396, 1401–02 (D.N.J.1996) (courts may rely on contention interrogatories on Rule 12 motion).

■ Contention interrogatories are designed to help defendants discern the basis for the claims against them. *See Orthmann*, 757 F.2d at 915 (contention interrogatories require plaintiff to particularize its theory of suit). Like factual assertions made in the complaint, answers to these interrogatories must be accepted as true; plaintiffs are under no burden to prove the factual validity of their answers. When making such allegations in a treaty case, however, a plaintiff is not free to assert that it understood the treaties to mean something wholly different from what they appear to say unless it can show how its understanding is grounded in some textual ambiguity. Plaintiff has failed to provide this textual link. Even with the application of the canons of treaty construction to take into consideration the unequal bargaining power of the treaty signers, it is apparent now that plaintiff's claims fall short of the mark. Although treaties "are to be construed, so far as possible, in the sense in which the Indians understood them," the court cannot rewrite or expand them "beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties." *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943); *see also South Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 506, 106 S.Ct. 2039, 2044, 90 L.Ed.2d 490 (1986) (court cannot rely on ambiguity in treaty that does not exist); *United States v. Choctaw & Chickasaw Nations*, 179 U.S. 494, 532, 21 S.Ct. 149, 164, 45 L.Ed. 291 (1900) (treaty cannot be interpreted inconsistently with clear import of its words).

## II. PLAINTIFF'S CLAIMS

### A. *Count I*

In Count I of its complaint, plaintiff contends that it retains treaty-reserved usufructuary rights in the territory it ceded under Article Sixth of the Treaty of 1831, 7 Stat. 342, on the east side of the Fox River and Green Bay, including "all waters within the area." The first paragraph of Article Sixth provided that

> The Menomonee [sic] Tribe of Indians shall be at liberty to hunt and fish on the lands they have now ceded to the United States, on the east side of the Fox river and Green bay, with the same privileges they at present enjoy, until it be surveyed and offered for sale by the President; they conducting themselves peaceably and orderly.

Defendants read this language to indicate that plaintiff's usufructuary rights in the ceded area were to continue only until the lands were surveyed or offered for sale, which occurred in 1834. Plaintiff makes four arguments in opposition to defendant's reading of the treaty, contending that the Menominee did not understand Article Sixth to limit the tribe's usufructuary rights to a specific duration and maintaining that the tribe's rights were not extinguished by the sale of the land. First: the Menominee depended on hunting, fishing and gathering for food, shelter, clothing and commercial activities and would never have agreed to a treaty that gave the government the right to take away their sustenance. In a related argument, plaintiff suggests that it trusted the government to protect its interests and that it would have been inconceivable to the tribe that its "Great Father" would take away the tribe's critical usufructuary rights when those rights were necessary to nourish the tribe's members. Second: land ownership and usufructuary rights were distinct and separable considerations and the tribe would not have had usufructuary rights in mind when it believed it was making a treaty that concerned only land ownership. Third: the Menominee did not understand the technical concept, "surveyed and offered for sale by the President," because that concept could not have been translated adequately into the Menominee

language. Fourth: even if the government could extinguish plaintiff's rights, it could do so only if the tribe were not conducting itself "peaceably and orderly" and the Menominee maintained peaceful relations with the United States.

### 1. *Dependence on usufructuary rights*

 I dealt with plaintiff's first argument in the last opinion, noting that although plaintiff may very well have met its subsistence needs through hunting, fishing and gathering at the time of the treaties, the focus of the inquiry today is not on what plaintiff needed at the time of the treaties but on what it agreed to in signing them. *See Menominee Indian Tribe,* 922 F.Supp. at 198. That plaintiff may have made a costly mistake in giving up its usufructuary rights in the 1831 treaty does not change what plaintiff agreed to in the treaty. It is no argument merely to state that plaintiff would not have agreed to relinquish rights because doing so would have been ill-conceived. No matter how bad the deal, it is not within the court's province to rewrite it. *See Choctaw and Chickasaw Nations,* 179 U.S. at 533, 21 S.Ct. at 164 (court cannot reform treaty to achieve justice or fairness); *United States v. Minnesota,* 466 F.Supp. 1382, 1385 (D.Minn. 1979) ("the courts cannot remake history or expand treaties and legislation beyond their clear terms to remedy a perceived injustice suffered by the Indians"), *affirmed sub nom. Red Lake Band of Chippewa Indians v. Minnesota,* 614 F.2d 1161 (8th Cir.), *cert. denied,* 449 U.S. 905, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980).

Plaintiff has not shown any reference to its subsistence needs in the treaty language. The Menominee may have trusted the United States, the "Great Father," to take the tribe's needs into consideration in making the treaty, but it does not follow that the United States agreed to do so in the manner the tribe allegedly anticipated, that is, by preserving the tribe's usufructuary rights. As the treaties demonstrate, the United States intended to turn the Menominee into domesticated farmers. *See* U.S. Agent Colonel Samuel Stambaugh, *Journal of the Proceedings of a Council at Green Bay,* July 18, 1831

at 10, dkt. # 71, tab 4 ("The land which was selected ... for your farming country will furnish comfortable homes for yourselves, your children and your children's children. I hope to live to see your fine fields covered with wheat, corn and potatoes.").[1] The 1831 treaty itself makes this intention clear. (Turning Indians into farmers was not necessarily as insensitive a bureaucratic solution as it has come to seem: in a report to the United States Secretary of War, United States Agent Stambaugh describes several Indian farming communities within or near the Menominee's territory, including cultivation of corn crops on Green Island in Green Bay and an Oneida settlement whose members were better farmers than the nearby French settlers. See U.S. Agent Stambaugh, Letter of November 8, 1831 at 571, 590–91, dkt. # 79, ex. B.) Article Fourth of the Treaty sets aside a reservation for the Menominee "upon which their improvements as an agricultural people are to be made." The purpose of the reservation was to "wean[ ] [the Menominee] from their wandering habits." Treaty of 1831, Art. 4th. The treaty did not promise open-ended usufructuary rights to the tribe. Rather, the United States recognized that it could not transform the Menominee into farmers overnight and it allowed the Menominee to continue to hunt, fish and gather until such time as the lands were "surveyed and offered for sale by the President." The United States intended, however, that when that event took place, the rights that the treaty had left open would be extinguished.

Historical documentation submitted by plaintiff does not advance its assertion that it failed to understand that the terms of the 1831 treaty imposed a durational limit on its usufructuary rights. Several journal entries made by the treaty commissioner, U.S. Agent Stambaugh, show that the treaty had been read to the Menominee and that they claimed to understand it. See Stambaugh, *Journal of the Proceedings of a Council at Green Bay, supra,* at 2, 6–7, 8.

John Carron, one of the two principal Chiefs of the Menominee Nation, then rose, and addressed his people as follows: Brothers, you have all of you, chiefs, warriors, men, women, and children, heard here in open day ... everything that our father has said.... I hope your eyes have been open, and everything our good Father has said to you has gone deep into your hearts. The things which have been done ... [have] now been fully explained to us. It is a plain matter, and I am well pleased with it.... [Y]ou have heard by the treaty which our Father has just read to us. Are you satisfied? The Chiefs and Warriors replied with one voice in the usual manner, "yes."

Another chief stated, "We understand well the provisions of the Treaty as you have explained them to us." *Id.* at 16. Although it is possible that plaintiff's leaders did not grasp the full import of the treaty even though they claimed to, the fact that the United States went over the treaty with them makes it less likely that the tribe was unaware of the treaty's full significance.

2. *Distinction between land ownership and usufructuary rights*

■ Plaintiff's second argument is equally unavailing. Although plaintiff may not have thought it was relinquishing usufructuary rights in the 1831 treaty, its lack of understanding does not relieve it of its agreement to give up those rights. *See Confederated Bands of Ute Indians v. United States,* 330 U.S. 169, 180, 67 S.Ct. 650, 655, 91 L.Ed. 823 (1947) ("We cannot under any rule of interpretation, hold that the Indians owned the lands merely because they thought so.").

Plaintiff's repeated assertion that use rights and ownership rights are different adds nothing to its argument. Defendants do not deny that the two are distinct. That is not the issue. The issue is whether plaintiff gave up both rights in the 1831 treaty. With respect to that question, there is no ambiguity in paragraph 1 of Article Sixth of the treaty. The paragraph speaks of plain-

---

1. Plaintiff's responses to defendants' contention interrogatories contain a number of attachments. Dkt. # 71–72. Although plaintiff did not tab these attachments, defendants have provided an index that identifies the attachments by number. *See* Defs.' Brief, dkt. # 79, app. I will refer to the tab numbers identified by defendants in citing to the documents in plaintiff's attachments.

tiff's "liberty to hunt and fish on the lands they have now ceded." Although land ownership may have been the primary focus of the treaty, hunting and fishing rights were clearly at issue.

The arguments set forth in the report of plaintiff's expert, Thomas Lund, do not alter this result. *See* Thomas Lund, *The Menominee Treaty Privilege of 1831: In Modern Law is it an Interest in Land?*, Pl.'s answers to contention interrogatories, dkt. # 71, tab 1. Lund suggests that plaintiff's use rights reserved by the 1831 treaty were not interests in land but were instead a privilege and immunity from state regulation. Even if Lund's theory is correct, it does not change the fact that plaintiff's "privilege and immunity" expired with the occurrence of the extinguishing events explicitly set forth in the 1831 treaty.

### 3. *Language barriers*

■ Plaintiff's third argument is that the tribe would not have understood the terms, "surveyed and offered for sale." In making this argument, plaintiff reveals a misunderstanding of what it must prove to establish that the 1831 treaty does not mean what it seems to. It is one thing for the tribe to show that a particular term would have had another meaning to treaty negotiators in the mid-nineteenth century; it is an entirely different thing for the tribe to say that its leaders would not have known the meaning of a particular term. An assertion of the first type would be relevant to determining the existence of a latent ambiguity; a claim of the second type, a lack of understanding by one party, is essentially immaterial. Unlike contracts between private parties, treaties must be enforced as written, even if they were obtained by fraud or duress. *See Menominee Indian Tribe*, 922 F.Supp. at 203 (citing cases).

Two of the treaties that the United States executed with the Chippewa provide examples of the kind of proof that will establish that the meaning of a treaty is something other than what it appears to be. In the 1837 treaty, the United States guaranteed the Chippewa that they could exercise their usufructuary rights in the territory they were ceding "during the pleasure of the President." *See United States v. Bouchard,* 464 F.Supp. 1316, 1323 (W.D.Wis.1978), *rev'd on other grounds sub nom. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341 (7th Cir.1983), *cert. denied,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). In 1842, the Chippewa ceded more land in another treaty that promised them "the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to move by the President" and made the Indians subject to removal from the territory "at the pleasure of the President." *Id.* at 1324. This condition is ambiguous: it can reasonably be read to mean that the Indians would be required to remove at the whim of the President or it could be read as saying that they would be able to stay as long as the President was happy with them, that is, if they did not misbehave. Extensive evidence confirmed that the second meaning was the one the negotiators for both sides had intended and understood. The United States had assured the Chippewa "that they would not be required to remove from their lands for a long time, possibly never, unless they misbehaved in some way." *Id.* at 1349.

The Menominee's asserted inability to understand the concept "surveyed and offered for sale by the President" might be relevant to the Menominee's understanding of the treaty, but it does not give the Menominee free license to invent an interpretation of the treaty that benefits them today. The Menominee need some type of textual link to support their interpretation. *See Lazore v. Commissioner of Internal Revenue,* 11 F.3d 1180, 1185 (3d Cir.1993) (treaty arguments "must have a textual basis"). Plaintiff does not cite such a link and admits that the extinguishing events (the surveying and sale of the land) did take place.

### 4. *Menominee's peaceful relations with United States*

■ The tribe attempts to set forth a textual basis for its first claim with its last argument, focusing on its 1831 treaty right to retain "the same privileges they at present enjoy, until [the land was] surveyed and of-

fered for sale by the President; they conducting themselves peaceably and orderly." Plaintiff contends that the Menominee were to lose their usufructuary rights only if its members failed to conduct themselves "peaceably and orderly." Ironically, this argument contradicts plaintiff's contention that it did not know that its usufructuary rights were even at issue. Plaintiff would have no reason to think its usufructuary rights were dependent on its conduct if it did not understand that its usufructuary rights were being negotiated.

Ignoring this apparent inconsistency, plaintiff cites a number of other treaties in which a tribe's continued usufructuary rights depended on its peaceable behavior. However, none of the cited treaties contain the same type of express extinguishment clauses found in the Menominee's 1831 treaty. For example, the Treaty of Greenville of 1795, 7 Stat. 49, allowed the affected tribes to "hunt within the [ceded territory] without hindrance or molestation, so long as they demean themselves peaceably, and offer no injury to the people of the United States." The treaty said nothing about limiting this hunting right to such time as the President surveyed and offered it for sale. The Treaty with the Saginaw Chippewa of 1819, 7 Stat. 203, incorporated this same "peaceable behavior" clause into its text and did not contain any other express extinguishing events. The Treaty of Washington of 1836 with the Ottawa and Chippewa of Michigan, 7 Stat. 491, permitted the tribes to retain their hunting rights as well as "the other usual privileges of occupancy, until the land is required for settlement."

The Ottawa and Chippewa treaty bears some resemblance to the 1831 treaty in that it appears to contain an extinguishing clause that is not dependent on the tribe's behavior. The extinguishing clause in the treaty has been interpreted as not extinguishing the tribes' right to fish, but as intended only to protect the right of non-Indians to settle in the ceded area without interference and to limit the Chippewa's right to hunt. Since the lakes were not needed for settlement, the tribes' reserved fishing rights were not terminated by the arrival of the non-Indians.

*People v. LeBlanc,* 399 Mich. 31, 248 N.W.2d 199, 207 (1976). Nonetheless, none of the cited treaties change the fact that the 1831 treaty stated that the Menominee's ability to hunt and fish on the ceded lands could continue only "until it be surveyed and offered for sale by the President; they conducting themselves peaceably and orderly." The natural reading of that clause is that the Menominee could continue to hunt and fish on the ceded lands until the President sold the land but that their right to do so would expire before then if they did not behave in a peaceable fashion. The Menominee's behavior between 1831 and 1834 was peaceable and their rights were not extinguished during that time. However, the "peaceably and orderly" clause lost any relevance once the President surveyed and offered for sale the ceded lands in 1834. In any case, even if plaintiff understood the "peaceably and orderly" clause to allow for the continuation of its usufructuary rights as long as it maintained amicable relations with the government and white settlers regardless of the President's sale of the land, any such right was extinguished by the Treaty of 1848, as explained in more detail later.

### B. *Count II*

Like its first claim, plaintiff's second claim is based on Article Sixth of the 1831 Treaty. Plaintiff contends that it has retained usufructuary rights in that part of Menominee country "adjoining the farming country, on the west side of the Fox river" and all waters within that area. The second paragraph of Article Sixth of the 1831 Treaty described the boundaries of the Menominee's lands on the west side of the Fox River and provided that

the boundary, as stated and defined in this agreement, of the Menomonee country, with the exception of the cessions herein before made to the United States, the Menomonee claim as their country; that part of it adjoining the farming country, on the west side of Fox river, will remain to them as heretofore, for a hunting ground, until the President of the United States, shall deem it expedient to extinguish their title. In that case, the Menomonee tribe promise to surrender it immediately, upon being

notified of the desire of [the] Government to possess it.

Defendants argue that the "hunting ground" and any attendant usufructuary rights the tribe retained in this area expired when the President deemed it expedient to extinguish the Menominee's title in these lands in the treaties of 1836 and 1848. Plaintiff takes a very different view. According to plaintiff, the treaty language "for a hunting ground, until the President of the United States, shall deem it expedient to extinguish their title" gave the United States the option of acquiring additional Menominee land in case it was needed for accommodation or recolonization of eastern Indians, an option the United States never exercised because the land ceded on the eastern side of the Fox River proved to be adequate for that purpose. *See* Stambaugh, Letter of November 8, 1831, *supra* (at time of 1831 treaty, Wisconsin was under consideration as colony site for eastern Indians). Plaintiff maintains that because the 1836 and 1848 treaties did not take the land for such a purpose and did not refer specifically to Article Sixth of the 1831 treaty, its usufructuary rights in these lands were never extinguished. Plaintiff argues also that Menominee leaders were surprised in 1836 when they learned that the United States interpreted the 1831 treaty to mean that the President could take the land west of the Fox River whenever he chose to do so. Apparently, the Menominee did not understand that to be what they had agreed to in 1831. Two of the Menominee leaders expressed concern about the interpretation of the 1831 treaty during the 1836 treaty negotiations. *See Journal of the Proceedings of a Council—Treaty of Cedar Point of 1836,* Aug. 29, 1836, dkt. # 72, tab 15. Chief Osh–Kosh stated:

> Father, we always thought that we owned the land that we occupied, but yesterday we heard that our great father had a right to take it when he wanted it. We do no[t] so understand the treaty. Father, here are some of the chiefs who went to Washington, who tell me that they only sold the land on the East side of the Fox River, and never bound themselves to their great father the president to sell that on the west side of the river and were much surprised

when they heard that the chiefs had agreed to sell the rest, when the president chose to take it from them.

*Id.* at 4. Chief Gau-a-tau remarked:

> Father, it was understood by us that our land on the east side of the Fox river we ceded to our Great Father not no more; nor did we bind ourselves to our Great Father that he should purchase the balance of our land on west side when he should require it. Father, our great father told us at Washington that the balance of our land on the west side of the Fox river should remain to, and be ours, as long as we should live, and that we should have the right to give a piece of our land on the west side of the river to the half breeds of Menominee blood, and that the President would not want to purchase any more of our land.

*Id.* at 4–5.

 Amicus Wisconsin Paper Council goes to great length explaining, with the aid of historical documentation, the flaws in plaintiff's contention that the extinguishment clause in paragraph 2 of Article Sixth was designed so that further land would be available if necessary for the recolonization of eastern Indians. *See* Wis. Paper Council's Brief, dkt. # 87, at 31–37. It is unnecessary to discuss the Paper Council's position because plaintiff's contention does not change the nature of the 1831 treaty, which provides that the President could extinguish the Menominee's title when he deemed it expedient. The treaty does not say that the President could do so only if necessary to make room for recolonization. Similarly, it does not follow from the absence of any specific reference in the 1836 and 1848 treaties to Article Sixth of the 1831 treaty that those treaties could not extinguish plaintiff's usufructuary rights as provided in Article Sixth. Chief Osh-kosh may very well have been surprised when he realized in 1836 that the 1831 treaty permitted the President to take the land west of the Fox River when he so desired, but his response does not affect the meaning of the 1831 treaty. Chief Gau-a-tau's statement is more troubling. He explained that during 1831 treaty negotiations, the govern-

ment told the Menominee that the land west of the Fox River would remain the tribe's as long as its members should live. Such a statement indicates that the United States may have misled the Menominee with respect to what the 1831 treaty would entail. However, the language in Article Sixth of the 1831 Treaty is not ambiguous with respect to the President's right to take the Menominee's land: he can do so when he finds it expedient. Even if the United States misled the Menominee on this point, this court cannot look beyond the clear treaty language and rewrite a treaty. Even treaties that are the product of bribery, fraud or duress are valid and must be enforced. *See Menominee Indian Tribe,* 922 F.Supp. at 203 (citing cases).

Plaintiff likens the 1831 treaty to the Chippewa's 1837 treaty considered in *Bouchard,* 464 F.Supp. at 1323, in which the Chippewa were permitted to remain on land they had ceded "[d]uring the pleasure of the President." I have discussed already the ambiguity and supporting evidence that led the court to find that the Chippewa's usufructuary rights would last indefinitely unless they misbehaved. Unlike the Menominee, the Chippewa had a textual basis for their belief that their usufructuary rights were unextinguished. "During the pleasure of the President" could be interpreted to mean that the Chippewa's ability to retain usufructuary rights was tied to their behavior. The Menominee's lack of any similar textual basis is fatal to their claim. The 1831 treaty permits the President to take lands when he deems it expedient. His ability to do so is not conditioned in any way on his view of the tribe's behavior.

In response to defendants' contention interrogatory #3, plaintiff alleges that the treaty commissioners told the tribe that its usufructuary rights would last indefinitely. Plaintiff supports this allegation by stating that it believed the "Great Father" would protect its interests. As previously discussed, the Menominee's faith in the "Great Father" is an insufficient basis on which to interpret the treaty in the manner plaintiff suggests. Nothing else in plaintiff's response indicates that the Menominee were

told that their usufructuary rights would continue indefinitely. In fact, a passage from Colonel Stambaugh's journal refutes this assertion:

> You have now drawn a line between the countries of the white and red man. You have kept the side nearest to your western forests. This is right, some of your people will no doubt, remain hunters a few years longer. But after awhile I hope to see an Indian country thickly settled ... and your rich lands will soon be covered with the comforts you so much require.

Stambaugh, *Journal of the Proceedings of a Council at Green Bay, supra,* at 19. Even if the government told plaintiff that its usufructuary rights would continue indefinitely, such a statement would not assist plaintiff, who would still need to show how that understanding was embodied in the text of the treaty or, at a minimum, show that the treaty did not preclude such an understanding, as the Chippewa did in the LCO litigation. *See Bouchard,* 464 F.Supp. 1316; *Lac Courte Oreilles Band,* 700 F.2d 341. Plaintiff has failed to make such a showing.

The Menominee argue that their continuing "to hunt, fish and gather all over the territory ceded in 1831, 1836 and 1848" is evidence that their usufructuary rights were not extinguished by the 1831 treaty. Such continued hunting does not prove that the tribe was exercising a legal right. *See Menominee Indian Tribe,* 922 F.Supp. at 201 (citing cases). Indeed, the historical documents contain several references to the government's displeasure with this activity and its efforts to put an end to it. *See* Annual Report of the Commissioner of Indian Affairs for 1846, at 256, dkt. #72, tab 19 ("those Menominee still lingering on the ceded lands have engaged to remove (by small parties at a time) within the present and the coming year."); Annual Report of the Commission of Indian Affairs for 1855, at 41, dkt. #72, tab 16 (Menominee have been advised "not to leave their reservation to rove through the country for the purpose of fishing, hunting, and gathering rice....").

### C. *Counts III, IV and V*

Plaintiff's third, fourth and fifth claims are based on its alleged unextinguished aborigi-

nal usufructuary rights in the waters of Lakes Michigan and Winnebago, Green Bay and part of the Wisconsin River. Defendants argue that plaintiff's asserted aboriginal usufructuary rights expired by the terms of the 1831 and 1836 treaties and contends further that even if they did not, the 1848 treaty extinguished those rights. Plaintiff acknowledges that the 1848 treaty was the government's attempt to acquire the remaining Menominee lands in Wisconsin and to remove the Menominee to Minnesota, but argues that cession of such lands did not include cession of its usufructuary privileges.

Five years after signing the Treaty of 1831, the Menominee executed the Treaty of 1836, 7 Stat. 506, in which the tribe ceded additional territory to the United States. *See Menominee Indian Tribe*, 922 F.Supp. at 193 (describing areas ceded). In addition, they agreed "to remove from the country ceded, within one year after the ratification of this treaty." Treaty of 1836, Art. 4th. As with their claims relating to the Treaty of 1831, the Menominee assert that they continued to hunt in the territories ceded in the Treaty of 1836 after the treaty was signed and thereby evidenced a belief that they maintained usufructuary rights and that the government accepted their claim to such rights. Although the Menominee may be correct that their continued usufructuary activities on the lands they ceded in 1836 are evidence of their belief that they continued to retain these rights, it does not appear that the government acceded to such a claim. *See* Annual Report of the Commissioner of Indian Affairs for 1845, at 496, dkt. # 71, tab 6 ("[S]ome of [the Menominee] still linger on their old haunts along the shore of the Fox river and Green bay; but they will, it is believed, soon be removed to their own land, without difficulty or delay."). In any case, the Menominee's continued activity in the areas ceded in 1836 is immaterial in light of the obligatory removal treaty of 1848.

In 1848, plaintiff signed a treaty more monumental in scope than any of its previous treaties, in which it agreed it would "cede, and do hereby cede, sell and relinquish to the United States all [its] lands in the State of Wisconsin whenever situated" in exchange for new lands in Minnesota and monetary compensation. Treaty of 1848, 9 Stat. 952. A delegation of Menominee traveled to Minnesota and found the new lands unsuitable. Plaintiff decided that it would not move and negotiated another treaty in 1854, exchanging the Minnesota lands for the area of Wisconsin that became its reservation. Treaty of 1854, 10 Stat. 1064.

In the previous opinion, I noted that

Enough questions persist about how the tribe perceived its obligations and cessions under the 1848 treaty to make it improper to hold as a matter of law that plaintiff could never show that the tribe understood the treaty as something far different from what it appears to be, that is, an in praesenti treaty of obligatory removal that by its nature would have had the effect of extinguishing all rights possessed by the tribe, including those of hunting and fishing.

*Menominee Indian Tribe*, 922 F.Supp. at 202. Defendants press plaintiff on this point in their contention interrogatories. In response, plaintiff explains that although it ceded lands in the 1848 treaty, it did not cede its usufructuary rights. Plaintiff recognizes that the 1836 and 1848 treaties were the types of removal treaties that generally extinguish all rights a tribe has in the lands from which it is removing. *See United States v. Michigan*, 471 F.Supp. 192, 240 (W.D.Mich.1979) (obligatory removal treaties use language obligating tribes to remove and set deadline for removal), *aff'd in part*, 653 F.2d 277 (6th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981). Nonetheless, plaintiff contends vigorously that its usufructuary rights remained intact because the President extended the tribe's permission to remain in Wisconsin for several years after the signing of the 1848 treaty and it continued to hunt and fish on the ceded lands.

 A tribe's failure to remove pursuant to a valid removal treaty does not change the effect of that treaty; a tribe may not revoke the bargain by deciding not to remove. *See New York Indians v. United States*, 170 U.S. 1, 19–20, 18 S.Ct. 531, 534–35, 42 L.Ed. 927 (1898); *see also Bouchard*, 464 F.Supp. at

1350 n. 17 ("Whether the Indians actually complied with the [removal obligation] does not affect its legal status. A valid removal order would have left the Indians without any legal interest in the land...."). Contrary to plaintiff's assertions, the court did not hold otherwise in *United States v. Michigan*. *See* 471 F.Supp. 192. The treaty in *Michigan* permitted removal "as soon as the said Indians desire it" and "[w]hen the Indians wish it" and did not require removal upon a fixed date or event. The court stated explicitly that the treaty was "at most ... a permissive removal treaty." *Id.* Thus, the treaty signed by the Ottawa and Chippewa in *Michigan* does not "parallel" the Menominee's situation in this case, as plaintiff argues.

 It is unclear whether plaintiff believes that if it had moved to Minnesota its usufructuary rights in Wisconsin would have remained intact. As illogical as such an assertion appears, it is one that would have to be accepted if plaintiff is to prevail on its position. Plaintiff's usufructuary rights were either extinguished by the 1848 treaty or they were not. Its continued stay on the ceded lands does not change the effect of the treaty, which was not dependent on the tribe's removal to Minnesota. As plaintiff admits, the treaty required such removal.

In the February 26 opinion, I noted that plaintiff might be able to show that the 1848 treaty was contingent upon its exploratory trip to its new reservation and its right to remain in Wisconsin for an additional two years. *See Menominee Indian Tribe,* 922 F.Supp. at 202. In its answers to defendants' contention interrogatories, plaintiff does not explain how it might be able to prove that this contingency helped it to preserve its usufructuary rights. Instead, by maintaining that it did cede its land, plaintiff recognizes that the 1848 treaty was not contingent upon the exploratory trip or the removal. The plain language of the treaty supports this conclusion. Article 6th of the 1848 Treaty provided:

> To enable the said Indians to explore and examine their new country, and as an inducement to an early removal thereto, it is agreed that the United States will pay the necessary expenses of a suitable delegation to be selected for that purpose, under the direction of the President.

Nothing is said about the Menominee's right to revoke the deal if they found the lands unsuitable. Rather, the government hoped that by seeing the lands, the Menominee would move there at an even earlier date. *See* Annual Report of the Commissioner of Indian Affairs for 1849, at 13, dkt. # 87, app. ( ... "*as an inducement to their early removal,* the sixth article provides for the sending of an exploring party, to examine their new country, with reference to determining in advance the best points for their permanent settlement and the making of other preliminary arrangements.") (emphasis added).

The Menominee's right to remain on the lands ceded in the 1848 treaty expired on October 18, 1850, two years after the treaty was signed. Nonetheless, the Menominee petitioned the United States to permit them to remain past this date and prevailed on their petition. *See Wisconsin v. Lane,* 245 U.S. 427, 429–30, 38 S.Ct. 135, 135–36, 62 L.Ed. 377 (1918) (Menominee petitioned for and President granted leave to remain on ceded lands until June 1, 1851); Annual Report of the Commissioner of Indian Affairs for 1851, at 4–5, dkt. # 71, tab 9 (President consented to Menominee's request to remain another year past June 1, 1851 "with the distinct understanding that this extension of time was to be considered an act of favor"). In August 1852, Congress authorized the Menominee's temporary removal to a site on the Wolf and Oconto Rivers that was to become their present reservation. *Lane,* 245 U.S. at 430, 38 S.Ct. at 135–36.

Once the Menominee arrived on the reservation, the tribe appeared to understand that it did not have the free-ranging usufructuary rights that it claims now. In fact, the Annual Report of the Commissioner of Indian Affairs for 1853 shows that Menominee Chief Oshkosh "ask[ed] permission to go away to gather rice." Annual Report of the Commissioner of Indian Affairs for 1853, at 52, dkt. # 71, tab 11. It seems unlikely that if the Menominee believed that they had retained usufructuary rights throughout the ceded lands, they

would have asked permission to exercise such rights. The government reinforced the limitations imposed on the Menominee's usufructuary rights in 1855 when it instructed the tribe "not to leave their reservation to rove through the country for the purpose of fishing, hunting and gathering rice." Annual Report of the Commissioner of Indian Affairs for 1855, at 41–42, dkt. # 72, tab 16.

The Menominee gained their present reservation in an 1854 treaty ceding their Minnesota lands in exchange for the lands on the Wolf and Oconto rivers to which the tribe had removed in 1852. By ceding the Minnesota lands, the Menominee acknowledged that the 1848 treaty had taken effect even though they had not removed to Minnesota. Otherwise, the Menominee would not have had the lands in Minnesota to exchange for those on its new reservation. The situation is directly analogous to that in *New York Indians*, 170 U.S. 1; 18 S.Ct. 531, in which the New York Indians's failure to remove to the land set aside for them did not affect the validity of their removal treaty. The Menominee's failure to remove had no effect on the cession of all the tribe's ownership and usufructuary rights in their Wisconsin lands.

Notwithstanding this fact, plaintiff contends that the 1848 treaty conferred only lands upon the United States and did not include a cession of plaintiff's usufructuary rights. Plaintiff's argument rests on the language of the 1848 treaty that plaintiff agreed to "cede, and do[es] hereby cede, sell, and relinquish to the United States all [its] lands in the State of Wisconsin wherever situated." Plaintiff contends that its usufructuary rights were not actually rights or interests in the ceded lands but rather were a qualified immunity from regulation not tied to the land. Even accepting plaintiff's contention that its usufructuary rights are not interests in land, plaintiffs' argument does not account for the fact that the 1836 and 1848 treaties were valid removal treaties. Plaintiff's alleged right to remain in these areas for usufructuary purposes is wholly inconsistent with its responsibility to remove from them. *See New York Indians*, 170 U.S. at 19–20, 18 S.Ct. at 534–35.

Plaintiff's loss of its usufructuary rights in Wisconsin as a result of the 1848 obligatory removal treaty applies equally to rights in state waters. Although the 1848 treaty spoke of a cession of all of plaintiffs' "lands in the State of Wisconsin wherever situated," it is logically inconsistent to hold that the Menominee would retain usufructuary rights in Wisconsin waters but not in the ceded lands when they agreed to move hundreds of miles to the west. Given the purposes of the 1848 treaty, neither the government nor the Menominee could have contemplated that they would have the right to return from Minnesota to use Wisconsin waters as they pleased. Plaintiff's citations to historical documents to show that its members continued to fish in Wisconsin waters after the 1848 treaty are of no weight. Similarly, it is unnecessary to address plaintiff's arguments concerning its allegedly unextinguished aboriginal usufructuary rights in the Wisconsin River Valley (Count V) and their "joint and amicable possession" with the Chippewa of that area. Any such rights were extinguished by the obligatory removal treaty of 1848.

## III. PLAINTIFF'S UNDERSTANDING OF ITS RETAINED USUFRUCTUARY RIGHTS

.. Plaintiff's consistent theme in this litigation is that its members never understood that they were giving up their usufructuary rights when they entered into the treaties with the United States, but understood instead that the treaties had reserved those rights to the tribe. Plaintiff has argued that it would be error to read the 1831 treaty as setting explicit temporal limits on the tribe's rights to hunt and fish without exploring the tribe's understanding about the duration of its rights. It has maintained that it should have an opportunity to adduce evidence that would shed light on the tribe's understanding of what it bargained for and retained when it signed the various treaties, including, among other things, evidence of the tribe's subsequent actions to the extent that they are reflective of the tribe's understanding of the treaties.

Despite plaintiff's assertions that the tribe has always understood that it retained its use

rights, its actions and statements over the last century suggest that this may not be so. Chief Osh–Kosh's request for permission to go outside the Wolf River reservation to gather wild rice certainly suggests that *he* did not believe the tribe remained free to exercise usufructuary rights in the territory it had ceded. Even if he was in error about the matter, the tribe's subsequent representations to various courts and commissions are a strong indication that it has known for quite some time that it had lost its usufructuary rights.

 As noted in the previous opinion, *Menominee Indian Tribe*, 922 F.Supp. at 209, in 1951, plaintiff petitioned the Indian Claims Commission for compensation to which it claimed entitlement because it had given up to the United States "all its right, title and interest in and to" the territory ceded in the 1831, 1836, 1848 and 1854 treaties. Plaintiff maintains now that this representation cannot be read as a reflection of an understanding that it had lost its usufructuary rights because 1) the tribe would not have made any reference to use rights before the claims commission, which was concerned with claims relating to land titles and not with lost hunting and fishing rights; 2) the commission existed to provide compensation for losses, not to declare rights or enjoin interference with their exercise; 3) plaintiff had no reason to include in its petition any claim for use rights because it had never lost such rights; and 4) the phrase, "all its right, title and interest in and to" lands was not intended to refer to hunting and fishing rights, which are neither a right to nor an interest in land but an immunity to hunt and fish without local regulation and would have been so understood by the commissioners.

Defendants have adduced extensive evidence from the public record that the claims commission was not only authorized to consider compensation for lost usufructuary rights but that it did so in a number of instances. The enabling legislation gave the commission a mandate to dispose of any and all claims that had accrued before 1946, whether legal, equitable or moral. The commission was to hear and determine claims in law or equity arising under the Constitution, laws or treaties of the United States; other claims in law or equity; claims that would result if the treaties, contracts and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake or any other ground cognizable by a court of equity; claims arising from the taking of lands by the United States without the agreed upon compensation; and claims "based upon fair and honorable dealings that are not recognized by any existing rule of law or equity." Act of Aug. 13, 1946, ch. 959 sec. 2, 60 Stat. 1049.

It is not accurate to say, as plaintiff does, that the claims commission rarely dealt with claims for lost use rights or that it did not know how to value such rights independently of land value. The issue of usufructuary rights arose in various cases brought before the commission under the enabling legislation. *See, e.g., Makah Indian Tribe v. United States,* 7 Ind.Cl.Comm. 509, 524–25 (1959) (finding that United States had not violated 1855 treaty rights by destroying the tribe's rights of sealing and fishing because restrictions imposed on both activities were no more than what was reasonable and necessary to conserve the resource); *see also Confederated Tribes of the Colville Reservation v. United States,* 43 Ind.Cl.Comm. 505, 551 (1978) (compensation of more than $3 million awarded for difference in retail value of fish to which tribe was entitled, less value of fish actually received because United States had failed to preserve tribal entitlement); *Sioux Tribe v. United States,* 23 Ind.Cl.Comm. 358, 363, 368 (1970) (awarding compensation for lost hunting rights, including those that were intended to be merely temporary (lasting only so long as the buffalo herd remained large enough to justify hunt); *Bay Mills Indian Community v. United States of America,* 22 Ind.Cl.Comm. 79, 80 (1969) (commission described compensation award as covering fair market value of tribe's encampment and value of ceded fishing rights); *The Tlingit and Haida Indians of Alaska v. United States,* 20 Ind.Cl.Comm. 508, 511–12 (1969) (examining whether United States had obligation to prevent unfair and excessive encroachments upon Indians' fishing and hunting grounds). These cases are evidence

that the scope of the commission's authority did extend to awards for lost usufructuary rights. They refute plaintiff's argument that the narrow scope of the commission's authority would have given plaintiff reason to think that the commission would not understand the reference to its loss of "all right, title and interest in and to" its former lands as not including usufructuary rights.

Plaintiff's second argument is a variation of the first. The tribe contends that it had no reason to raise any issue of usufructuary rights before the commission because plaintiff's actual dispute was with the state of Wisconsin, which was restricting the tribe from exercising its off-reservation use rights. The commission would have had no authority to declare the scope of plaintiff's rights with respect to the state or to order the state to compensate plaintiff for its century of interference with those rights. This is a plausible explanation for not bringing a claim of lost use rights to the commission for compensation. However, it does not explain why the tribe used the sweeping language it employed in its petition: "*all* right, title and interest in and to" lands if, in fact, it had not lost its valuable right to hunt, fish and gather throughout its former territory free of state regulation.

In response to questions concerning why it utilized such broad language if it intended to make only a limited claim, plaintiff falls back on Professor Lund's characterization of usufructuary rights as unrelated to interests in land, arguing from his report that any settlement of its *land* claims would not have encompassed its usufructuary rights. Plaintiff asserts that because it was well established in 1951 that usufructuary rights were unrelated to interests or rights in land, neither the United States nor the commissioners would have understood the tribe's statement in its petition as referring to usufructuary rights. The fallacy in plaintiff's argument is that the courts have held reserved usufructuary rights to be interests related to land since at least 1905, when the Supreme Court decided *United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089, a suit brought to enjoin certain persons in the state of Washington from obstructing the Yakima

Nation's fishing rights. In holding that accommodations had to be made to ensure the Indians the fishing rights to which they were entitled, the Court characterized the reserved right to fish as imposing "a servitude upon every piece of land" ceded by the Yakima Nation. *Id.* at 381, 25 S.Ct. at 664. "[T]he Indians were given a right in the land—the right of crossing it to the river—the right to occupy it to the extent and for the purpose mentioned." *Id.* In 1916, the Supreme Court characterized a hunting and fishing right in the same way. *See Kennedy v. Becker,* 241 U.S. 556, 562, 36 S.Ct. 705, 707, 60 L.Ed. 1166 ("We assume that [the Seneca] retained an easement [to hunt and fish], or profit *à prendre,* to the extent defined [in the Treaty of the Big Tree of 1797] ). *See also Van Camp v. Menominee Enterprises, Inc.,* 68 Wis.2d 332, 343, 228 N.W.2d 664 (1975) (collecting scholarly writings characterizing usufructuary rights as interests in land in nature of *profit à prendre* ); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341 (7th Cir.) (scope of treaty-recognized non-reservation fishing rights are similar to a *profit à prendre* ); *cert. denied,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983); *Lac du Flambeau Indians v. Stop Treaty Abuse-Wisconsin, Inc.,* 759 F.Supp. 1339, 1350 (W.D.Wis.1991) (Wisconsin's definition of real property includes interests such as treaty-reserved usufructuary privileges), *aff'd in relevant part; reversed in other parts,* 991 F.2d 1249, 1258 (7th Cir.1993). In 1985, the United States Supreme Court held that when the Klamath Indians ceded "all their right, title and claim" to certain land, they gave up any off-reservation hunting and fishing rights as well and that subsequently, when it was discovered that the tribe's reservation boundaries were inaccurate and the Indians executed a cession agreement in 1901 under which they were compensated for the excluded land and ceded "all their claim, right, title and interest in and to" that land, the language used encompassed any right to fish and hunt on the excluded, non-reservation land. *Oregon Dept. of Fish and Wildlife v. Klamath Indian Tribe,* 473 U.S. 753, 770, 105 S.Ct. 3420, 3430, 87 L.Ed.2d 542 (1985). The Court was persuaded that although the Kla-

math tribe's hunting and fishing rights were not enumerated separately, "unquestionably," they were included in the conveyance. *Id.* at 766, 105 S.Ct. at 3428. The court of appeals had held that the omission of any reference to hunting and fishing rights in the cession agreement was consistent with the interpretation that Congress had not intended to abrogate the use rights but the Supreme Court found that the court of appeals had erred in considering the rights separate from the tribe's land ownership; the 1864 treaty provided explicitly for the tribe to remove to their reservation and remain unless they had permission to leave temporarily and it gave the tribe an exclusive right of fishing and gathering on the reservation that would have been inconsistent with a hunting and fishing right off the reservation where exclusivity would have been impossible on lands open to non-Indians. *Id.* at 767, 105 S.Ct. at 3428–29. As additional support for the conclusion that the tribe had never understood that it had a right to hunt and fish separate from its interest in the land, the Court noted that the boundary commission report that preceded the 1901 agreement had made no separate valuation of the right to hunt and fish on the ceded lands, *id.* at 773, 105 S.Ct. at 3431–32, and that when the tribe had been afforded an opportunity additional compensation before the Indian Claims Commission for the ceded lands, it had agreed that the highest and best use for the ceded lands was commercial lumbering and livestock grazing and had made no reference to any hunting and fishing rights. *Id.* at 774, 105 S.Ct. at 3432 (citing *Klamath and Modoc Tribes v. United States,* 20 Ind.Cl.Comm. 522, 525 (1969)).

■■■■■■ It is questionable, moreover, whether plaintiff can assert the position in this case that hunting and fishing rights are not interests in land when in another lawsuit, a corporation with which plaintiff is in privity prevailed on the position that hunting and fishing rights *are* interests in land. In *Van Camp,* 68 Wis.2d 332, 228 N.W.2d 664, Menominee Enterprises, Inc. argued that it could not have made a valid transfer of any fishing and hunting rights to persons who purchased real estate from the corporation because such transfers would have been

transfers of real property that were invalid for lack of stockholder approval and for failure to comply with the statute of frauds' requirement for the transfer of an estate or an interest in lands. *Id.* at 341–43, 228 N.W.2d at 669–70. The corporation argued exactly what plaintiff disavows in this case: that the hunting and fishing privileges at issue constituted an easement or a *profit à prendre* and are thus real property within the meaning of Wisconsin law. See Wis.Stat. ch. 706. As a corporation owned entirely by the members of the tribe, formed pursuant to the Menominee Termination Act, 25 U.S.C. § 891–902, to receive and manage all of the real and personal property that had been held in trust by the United States until the termination of federal supervision over the tribe's affairs and property, *id.* at 334–35, 228 N.W.2d at 665–66, Menominee Enterprises was in privity with the tribe. Under the doctrine of issue preclusion (collateral estoppel), plaintiff would be estopped from arguing that usufructuary rights are not interests in land; the judgment on the merits obtained by its privy in the *Van Camp* case precludes relitigation in a later suit of the issue of the nature of usufructuary rights, which was determined in the first suit. *In re Freeman,* 30 F.3d 1459, 1465 (Fed.Cir.1994) (citing *Lawlor v. National Screen Serv. Corp.,* 349 U.S. 322, 326, 75 S.Ct. 865, 867–68, 99 L.Ed. 1122 (1955)). Issue preclusion does not require that the claim in the first and second suits be identical. *Id.* "Rather, application of issue preclusion centers around whether an issue of law or fact has been previously litigated." *Id.* (citing *International Order of Job's Daughters v. Lindeburg & Co.,* 727 F.2d 1087, 1091 (Fed.Cir.1984)). "Issue preclusion is appropriate only if (1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the party to be precluded had a full and fair opportunity to litigate the issue in the first action." *Id.* (citing *A.B. Dick Co. v. Burroughs Corp.,* 713 F.2d 700, 702 (Fed.Cir. 1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984)). Nothing in the

*Van Camp* opinion suggests that any of these conditions was not met in that case.

In addition to the representations of total loss of *all* rights that plaintiff made to the claims commission, plaintiff has made similar representations to other courts. *See* discussion in *Menominee Indian Tribe,* 922 F.Supp. at 213, relating to plaintiff's suits for relief in the Wisconsin state courts and in the United States Court of Claims after the state began to regulate plaintiff's on-reservation hunting and fishing upon the federal government's termination of the tribe's reservation status in 1954. In its suit before the Court of Claims, plaintiff quoted the finding of the Supreme Court of Wisconsin in *State v. Sanapaw,* 21 Wis.2d 377, 124 N.W.2d 41 (1963), *cert. denied,* 377 U.S. 991, 84 S.Ct. 1911, 12 L.Ed.2d 1044 *reh'g denied,* 379 U.S. 871, 85 S.Ct. 17, 13 L.Ed.2d 78 (1964), that it was "unlikely that the Menominee would have knowingly relinquished their special fishing and hunting rights which they enjoyed on their own lands, and have accepted in exchange other lands with respect to which such rights did not exist." *Id.* at 383, 124 N.W.2d at 44. By advancing this finding to the Court of Claims and later, on appeal, to the United States Supreme Court, plaintiff seems to have adopted the position that, in fact, it had lost its off-reservation fishing and hunting rights in the nineteenth century.

These indications of plaintiff's understanding of the treaties are not determinative of its claim but they add support to the conclusion that plaintiff cannot succeed on its present assertion that the tribe understood the treaties as reserving their hunting and fishing rights.

## IV. JUDICIAL ESTOPPEL

■ In the February 26 opinion, I noted that plaintiff's claims might be barred by the doctrine of judicial estoppel because it appeared that in previous legal proceedings the tribe had taken a position contrary to its present position that it has retained its usufructuary rights in the lands and waters of its former territory. *Menominee Indian Tribe,* 922 F.Supp. at 208. *See Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1427 (7th Cir.1993) (judicial estoppel forbids a litigant from obtaining "a victory on one ground and then repudiat[ing] that ground in a different case in order to win a second victory"). The doctrine of judicial estoppel protects the integrity of the courts. *Edwards v. Aetna Life Ins. Co.,* 690 F.2d 595, 598–99 (6th Cir. 1982). It is intended to prevent litigants from "playing fast and loose with the courts." *Id.*

Shortly after plaintiff filed its petition with the Indian Claims Commission, asserting that it had relinquished to the United States "all right, title and interest in and to" the territory ceded in the 1831, 1836, 1848 and 1854 treaties, plaintiff settled all its claims with the United States through the Court of Claims, "including land claims arising under the Treaties of February 8, 1831, September 3, 1836, October 18, 1848 and May 12, 1854" for $8,500,000. *Id.* at 209. Plaintiff's acceptance of that settlement suggests that plaintiff succeeded in selling a position to the Court of Claims that is contrary to the position it is asserting today, which is that it did not lose *all* its rights, but retained its off-reservation usufructuary rights. I did not rule on the applicability of the doctrine in the February 26 opinion because some questions remained as to the linkage of the Indians Claims Commission petition and the Court of Claims settlement, *id.* at 212, but I allowed the parties an opportunity for additional briefing and oral argument on the question.

Because I have determined that plaintiff's claims must be dismissed on the merits, the applicability of judicial estoppel assumes less importance to the outcome of defendants' motion to dismiss. However, it bears further discussion.

■ As before, plaintiff argues that the doctrine of judicial estoppel cannot be applied to an Indian tribe because equitable defenses cannot be asserted to bar tribal claims arising from aboriginal occupancy of land. *See Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 670, 99 S.Ct. 2529, 2539, 61 L.Ed.2d 153 (1979) (citing *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 677, 94 S.Ct. 772, 782, 39 L.Ed.2d 73 (1974) (Indian title can be extinguished only with federal consent); *see also Oneida v. Oneida*

*Indian Nation,* 470 U.S. 226, 244 and n. 16, 105 S.Ct. 1245, 1256–57 and n. 16, 84 L.Ed.2d 169 (1985) (suggesting that equitable doctrine of laches would not extinguish Indian title); *Schaghticoke Tribe of Indians v. Kent School Corp.,* 423 F.Supp. 780, 784 (D.Conn.1976) (application of defenses of adverse possession, laches, waiver and estoppel to a suit by tribe to regain possession of Indian lands "inconsistent with federal posture of trust and vigorous protection of Indian rights"). As I explained in the February 26 opinion, defendants are not raising an equitable defense as a means of terminating plaintiff's interest in land; they are raising the defense to show both that plaintiff has always understood that it relinquished its usufructuary rights to the United States under the 1831 treaty or the 1848 treaty and that it sought and obtained compensation for the loss from the United States through a settlement entered into in 1951. Moreover, judicial estoppel is wholly different from laches, adverse possession and the statute of limitations, all of which are based upon delay and failure to assert one's rights. Such defenses of inaction are not properly raised against Indian tribes, which have had the status of wards in a position of trust with the United States. The doctrine of judicial estoppel is intended to apply to persons who have acted knowingly and intentionally. Finally, it is inaccurate to say that equitable defenses can never apply to Indian tribes. I am aware of no case holding that the doctrines of issue preclusion (collateral estoppel) or claim preclusion (res judicata) can never apply to an Indian tribe. Plaintiff has not cited any. *Cf. Mille Lacs Band of Chippewa Indians v. Minnesota,* 853 F.Supp. 1118, 1136–38 (D.Minn.1994) (examining facts of Mille Lacs Band litigation to determine whether previous litigation by Mole Lake Band had preclusive effect without suggesting that equitable doctrines of claim or issue preclusion could not apply to Indian tribes).

Plaintiff argues that no court has ever applied judicial estoppel to Indian land claims. It asserts that the doctrine is not applied to the United States, a sovereign power, and by extrapolation should not be applied to a sovereign tribe, but its citations do not support its basic premise. No court has held that the doctrine could not be applied to the United States and at least one court has done so. *See United States v. Owens,* 54 F.3d 271, 275 (6th Cir.1995) (Postal Service would be judicially estopped from arguing contrary to the position it had adopted in earlier litigation on which it had prevailed). A number of courts have refrained from applying the doctrine because they were persuaded that the facts did not support application, not because they believed it was improper as a matter of policy to apply it to the sovereign. *See, e.g., Levinson v. United States,* 969 F.2d 260, 265 (7th Cir.) (prior agreement by government not to seek fraud penalties not the same as saying that no fraud had occurred; therefore, federal government not barred by doctrine of judicial estoppel from arguing fraud), *cert. denied,* 506 U.S. 989, 113 S.Ct. 505, 121 L.Ed.2d 441 (1992); *Young v. United States Dept. of Justice,* 882 F.2d 633, 639 (2d Cir. 1989) (finding that government agent did not intend to mislead court when he applied for an order under Right to Financial Privacy Act to gain procedural advantage for government; there was room for difference of opinion whether act was applicable so that government is not barred from arguing that act does not apply to it as defense to plaintiff's claims that government violated act), *cert. denied,* 493 U.S. 1072, 110 S.Ct. 1116, 107 L.Ed.2d 1023 (1990). I conclude that no policy or rule of law prevents the application of judicial estoppel to Indian tribes.

██ Plaintiff no longer argues that defendants have failed to show that the settlement the tribe received in 1951 covered all of the claims it had made, both before the Indian Claims Commission and before the Court of Claims. Following the March 22, 1996 hearing on judicial estoppel, plaintiff received documents from the law firm that had represented the tribe in the Court of Claims and Indian Claims Commission in 1951. These documents connect the proceedings in the two forums. In a July 10, 1951 letter to the Attorney General of the United States, the tribe's attorney states:

> It is understood and agreed that the said joint motion and stipulation will not be filed with the Indian Claims Commission

until a judgment in the sum of $8,500,000 has been entered by the United States Court of Claims in the case of *Menominee Tribe of Indians v. The United States,* No. 44304, ... since the consideration for the dismissal of said petition before the Indian Claims Commission is the entry and payment of said judgment.

Letter of Andrew E. Stewart. Even though the letter establishes that the $8,500,000 was in settlement of all claims made in both proceedings, plaintiff continues to argue that its litigating posture in this case is not affected by its assertion in the 1951 petition to the Indian Claims Commission that it had given up "all its right, title and interest in and to" the territories ceded in the four nineteenth century treaties. In section III, supra, I discussed plaintiff's arguments that it would not have included any claim for use rights because such claims were not within the scope of the commission's mandate and because it had not lost its use rights; and that neither plaintiff's attorneys nor the commissioners would have considered use rights to be rights or interests in and to lands, both because use rights are considered to be in the nature of an immunity from local regulation and not an interest tied to land as explained in the Lund report and because it was not until years later that the Supreme Court decided *Klamath,* 473 U.S. at 770, 105 S.Ct. at 3430, interpreting a similar phrase as encompassing use rights.

Although I continue to believe that plaintiff has taken positions in other courts that are inconsistent with its present position that it never lost its usufructuary rights and I am convinced that the doctrine of judicial estoppel applies to Indian tribes in the same way as it applies to other litigants, I am not persuaded that this is an appropriate case in which to apply the doctrine. Application of the doctrine of judicial estoppel is harsh medicine. It should be applied only upon a finding of intentional action; at a minimum, the party seeking application of the doctrine must show that its opponent has made an explicit representation in one proceeding that can be shown to be contrary to a representation in a subsequent proceeding. As strong as the indications are that plaintiff was asking for compensation for everything it had

lost, including the opportunity to hunt and fish throughout its former territories free of unnecessary local regulation, it is not possible to say with certainty that plaintiff intended to represent to the claims commission that it had lost its use rights. Defendants are not able to cite any evidence that plaintiff discussed this matter with its attorneys, that plaintiff made any reference to the rights in its representations to the commission or to the court of claims, that the United States asked specifically about use rights or even that the issue was brought to plaintiff's attention before it filed its petition. The parties reached a final settlement before plaintiff would have had an opportunity to explain to the commission exactly what it was referring to in its petition. I cannot say that plaintiff's prior statement was a knowing and intentional representation to the judicial officer, rather than a mistake or oversight.

It is one thing to say that a party's previous litigating posture is corroborative of its previous understanding of a particular point. It is another thing to say that the same litigating posture bars it from the courts. Thus, despite the many indications that plaintiff's understanding has always been that it lost its off-reservation hunting and fishing rights through its treaties with the United States, I am not prepared to hold that when it said in its petition that it had lost "*all* right, title and interest in and to" land, it is so evident that it was including its usufructuary rights that it is estopped from stating otherwise in any other judicial proceeding.

## V. SUMMARY

In the February 26 opinion I expressed hesitation about dismissing this case without allowing plaintiff the opportunity to develop evidence demonstrating that the treaties should be read as granting the Menominee usufructuary rights of indefinite duration. *Menominee Indian Tribe,* 922 F.Supp. at 216. However, now that it has become apparent that plaintiff cannot articulate a legitimate textual basis for its claims, I see no reason to delay a decision in this case. Although 20 months have passed since plaintiff filed this action, during which time plaintiff's experts have been researching and develop-

ing their theories, plaintiff has not come forward with any factual allegations linked to specific treaty language. Because plaintiff has failed to state a claim upon which relief may be granted and because it has given no indication that it will be able to do so in the future, dismissal on the merits is warranted.

### ORDER

IT IS ORDERED that the motion of the Wisconsin Paper Council for leave to serve and file a reply amicus brief is GRANTED; the motion to reconsider of defendants Tommy G. Thompson, George E. Meyer, James T. Addis, John E. Fryatt, Herbert F. Behnke, Trygbe A. Solberg, Neal W. Schneider, Betty Jo Nelsen, Mary Jane Nelson, James E. Tiefenthaler, Jr. and Stephen D. Willett is GRANTED; and plaintiff's claims in Counts I, II, III, IV, and V of its complaint are DISMISSED in their entirety, with prejudice. The clerk of court is instructed to enter judgment for defendants and to close this case.